## SUN–HERALD CORPORATION v. DUG-GAN, Collector of Internal Revenue.

## NEWS PUB. CO. OF BALTIMORE v. SAME.

Nos. 94, 95, Docket 20368, 20369.

Circuit Court of Appeals, Second Circuit.

Feb. 26, 1947.

Neil P. Cullom and De Forest & Elder, all of New York City, for appellants.

Laurence H. Axman and John F. X. McGohey, U. S. Atty., both of New York City, for appellee.

Before L. HAND, AUGUSTUS N. HAND, and FRANK, Circuit Judges.

L. HAND, Circuit Judge.

The plaintiffs appeal from judgments in two actions to recover income taxes which they allege had been wrongfully assessed against them for the year 1930. The facts are so nearly alike in each case that it will not be necessary to deal with the appeals separately. Although the important question is whether the plaintiffs received any income whatever in 1930, they raise a subsidiary objection of which we will dispose at the start: i. e. whether they were not in any event exempt under subdivision fourteen of § 103 of the Rev-

enue Act of 1928, 26 U.S.C.A. Int.Rev.Code, § 101(13). We ruled this precise point against one of them in the case of a tax for an earlier year,[1] and, although in Roche's Beach, Inc. v. Commissioner,[2] we did somewhat modify what we had said, it was no more than to hold that the certificate of incorporation was not the only test of whether a corporation was "organized" for educational or other similar purposes under subdivision fourteen. In the case at bar, no matter how broadly one views the evidence, these plaintiffs were not "organized" for the purpose of aiding any educational purpose. True, by 1930 they had ceased to have any other activity than to hold property for a municipal art museum; but that will not serve. If they are to succeed, it can only be because the income on which they were taxed was not their income, but that of another corporation which concededly was exempt under subdivision fourteen. We proceed therefore to a statement of the facts relevant to that issue.

The Sun-Herald Corporation had been organized in 1920 to publish the New York Sun and the New York Herald; the News Publishing Company had been organized in 1908 to publish the Baltimore News and the Baltimore American. All the shares of both companies were owned by the Frank A. Munsey Company, and all of the shares of that company were owned by Frank A. Munsey. Before the end of 1924 the Frank A. Munsey Company had already sold the Sun, and on December 31, 1924, it sold the Herald, receiving in exchange $4,500,000, payable yearly in ten equal notes, bearing five per cent interest. On December 31, 1923, it sold both the Baltimore papers, one for $1,800,000, the other for $1,200,000, each payable also yearly in ten equal notes, bearing six per cent interest. Munsey died on December 22, 1925, leaving a will in which he made the Metropolitan Museum of Art in New York his residuary legatee. (Museum Estates, Inc., is a corporation later organized to hold the Munsey property on behalf of the Museum.) The executors were ready to distribute the residue by the end of 1927, and the question on which these appeals turns is whether before December 18, 1930, they had transferred to Museum Estates, Inc. the notes which remained unpaid. If they had transferred them on February 29, 1928, the interest falling due upon them in 1930 was income of Museum Estates, Inc.; if they did not transfer them until December 18, 1930, it was the income of the plaintiffs.

On the earlier of these dates the executors and their attorneys met to transfer all the residue of the Munsey property. In advance of the meeting—January 11, 1928—an attorney for the executors prepared a memorandum to be used at the transfer. After providing for specific and pecuniary legacies this prescribed the transfer to the Museum of the shares of another Munsey company—the Munsey Trust Company—by the Frank A. Munsey Company which held them, and the conveyance of some real property; and it concluded that the "miscellaneous securities still in hand should be transferred to the museum by a general power of sale and proper stock powers should also be executed." When the executors met on February 29 they passed a resolution "that all the assets of the Estate of Frank A. Munsey, deceased, shall be promptly transferred"; and the directors of the Frank A. Munsey Company on the same day passed a resolution that "all of the assets of the company" should be transferred with exceptions not relevant here. Also on that day the executors addressed a paper to the Guaranty Trust Company—incidentally itself an executor—declaring that they had transferred to the Museum, "the entire residuary estate, and this letter will, therefore, authorize you to hereafter hold for the account of * * * (the) Museum * * * $4,455,000 par value, New York Sun, Inc., 5% bonds, $933,446.42 of New York Sun, Inc. 5% notes and any cash, which we now have on deposit with your company." (The income on these securities does not come into the present case.) Finally, on the same day the executors and the Museum entered into an "agreement" by which the Museum "receives and accepts from the executors securities and properties * * * an item-

[1] Sun-Herald v. Duggan, 2 Cir., 73 F. 2d 298.

[2] 96 F.2d 776.

ized list of which is specified in the schedule" annexed. In this schedule appeared all the shares of the Frank A. Munsey Company and of the Munsey Trust Company and other specified items, not including either the shares of the plaintiffs or the notes. In compliance with the foregoing resolution of its directors, the Frank A. Munsey Company transferred "all the assets" of that company with the exceptions mentioned in the resolution. The shares of both plaintiffs were endorsed and delivered to the Guaranty Trust Company to be held on a "trustee account" for Museum Estates, Inc. The "Custody Division" of the Guaranty Trust Company thereupon issued a paper saying that it had "Received for Account of Museum Estates, Inc. from Metropolitan Museum of Art, Securities stated below which will be held in safekeeping." This paper mentioned all the notes then outstanding and the shares of the News Publishing Company, of the Sun-Herald Company, and some other securities not important here. The testimony of the witnesses as to what took place at the meeting throws no light upon the transaction; so far as appears, the parties intended to do whatever their lawyers had put into the papers, and had no other intent.

Thus matters stood at the end of February. On or before March 19, the Tribune Company made a payment upon its notes by two cheques, one to the order of the Sun-Herald Company, the other to that of the Frank A. Munsey Company; these were endorsed to the Museum Estates, Inc., and delivered to its treasurer; but the Tribune was told in the future to make cheques payable to Museum Estates, Inc. Shortly thereafter a letter followed telling the Tribune to address "future communications" to Museum Estates, Inc. The Tribune did make the next cheque so payable, but for some unexplained reason all later cheques were made payable to the Sun-Herald Company, and were endorsed to Museum Estates, Inc. The books were kept so as to show the notes as property of the Sun-Herald Company and the payments as made to it. The income tax returns for the years 1928, 1929 and 1930, returned the interest on the notes as income of that company. The notes given for the Balti-

more papers were treated so nearly the same way as to need no separate statement.

On December 18, 1930, it was decided to transfer such of the notes as remained unpaid to Museum Estates, Inc. The directors of the Sun-Herald Company met and passed a resolution reciting that its "sole assets" were the outstanding Tribune notes and some indebtedness of Museum Estates, Inc. to the company, and that they wished to dissolve it and turn over its assets to that company. In accordance with this resolution the notes—which had theretofore never been endorsed—were endorsed to Museum Estates, Inc.; and they ceased any longer to be kept on the books as assets of the Sun-Herald Company. No delivery was necessary, or indeed possible, for the notes were already in the "Custody Division" of the Guaranty Trust Company. Substantially the same course was followed in the case of the News Publishing Company, the only difference being that real estate was retained by that company of the value of about $200,000 to pay outstanding indebtedness to third persons. Neither plaintiff was ever taxed upon income falling due after December 18, 1930; and the purpose of the transactions of that day was to put an end to any further chance that they should be.

Upon this evidence the judge found that the notes had remained the property of the plaintiffs until December 18, 1930, and we cannot see what other finding was open to him. It is indeed impossible to know why the notes were not transferred on February 29, 1928, along with the rest of the residuary estate; the witnesses called had either forgotten the reason, if they ever knew it, or it had been the possession of those alone who had died. The inexplicability of the transaction as it stands is therefore some ground a priori for supposing that the form did not express the intent; but it is not enough, for the uniform treatment of the notes throughout was such that we cannot avoid concluding that there must have been some purpose which the parties deliberately meant to realize by the form of the transaction that they adopted. The evidence, fairly considered, is too strong to admit of any other inference. Although it was apparent-

ly the purpose to transfer all Munsey's property in 1928, the notes were not mentioned; moreover, although the shares of both plaintiffs were endorsed, as would normally be done, if a transfer was intended, the notes were not endorsed. It is true that negotiable paper can be transferred without endorsement,[3] but possession and delivery do not raise any presumption of ownership in New York,[4] any more than they do elsewhere.[5] Finally, we regard it as highly significant that these notes were consistently carried on the books as assets of the plaintiffs, and, perhaps as more significant than any other single circumstance, that the plaintiffs paid income taxes assessed upon the interest falling due upon them in 1928, 1929 and 1930.

If any doubt could remain, the resolutions of December 18, 1930, were explicit in their recitals that the notes were still the property of the plaintiffs, and their endorsement was quite unnecessary, if title had already passed. One witness apparently did mean to intimate that all these things were done out of abundant caution, but, if so, it is strange that the resolutions should have been so drawn as to contradict any such interpretation of their status. If there had been an unequivocal act of transfer, like a deed, which, unless impeached, changes ownership ex proprio vigore, regardless of the parties' later characterizations, no matter how often repeated, we should hold otherwise; but there was none. No agreement affected to transfer them; indeed nothing took place which could have transferred them except the delivery on February 29, 1928, and that, as we have seen, carried no presumption that it was a transfer; and even if it had, would have been contradicted by substantially all that followed. There was no mistake; not only

did each step succeed the last with entire consistency (with the single exception of the letters regarding payment in the spring of 1928), but nowhere does any suggestion appear that the records did not correctly express the parties' intention.

The law of corporations allows the fabrication of such elaborately involuted jural persons, as Munsey seems to have thought important in his affairs; and out of them authentic rights and duties will emerge. Although there are occasions when courts will brush them aside, and decide controversies as though only the human actors had been concerned, when there is no such occasion, the rights and duties that result must be respected and enforced like any others. There was no reason which forbad the persons in charge of these transactions to treat the notes as property of the plaintiffs; and not only are we justified in taking them at their word, but we have no alternative. It is idle to ask us to look "realistically" at what they did; that is a word always indicating either an inability to discover, or an unwillingness to tell, the determining factors; we study always to eschew it. It is true that these persons had it easily in their hands to exempt this money from taxation, and it is strange indeed that they did not use their power; but use it they did not; on the contrary they gave the most positive evidence that they did not mean to take those steps which alone would exempt it. We cannot now unravel the web they then wove, glad as we might be to do so.

The validity of the amended claims for refund does not arise in the view we take of the merits.

Judgments affirmed.

---

[3] N. Y. Negotiable Instruments Law, Consol.Laws, c. 38, § 79.

[4] Price v. Brown, 98 N.Y. 388; Ensign v. Hooker, 16 Misc. 492, 38 N.Y.S. 968;

Congress Trucking Co. v. Alton Dress & Waist Co., Sup., 154 N.Y.S. 156.

[5] Daniel on Negotiable Instruments, § 846.