COMMISSIONER OF INTERNAL REV-
ENUE, Petitioner,

v.

JOHN DANZ CHARITABLE TRUST,
Respondent.

No. 16729.

United States Court of Appeals
Ninth Circuit.

Nov. 26, 1960.

Charles K. Rice, Asst. Atty. Gen., Lee A. Jackson, Harry Baum, Helen A. Buckley, Attys., Department of Justice, Washington, D. C., for petitioner.

F. A. LeSourd, LeSourd, Patten & Adams, Seattle, Wash., for respondent.

Before CHAMBERS, Chief Judge, and JERTBERG and KOELSCH, Circuit Judges.

JERTBERG, Circuit Judge.

Before us is a petition to review a decision of the Tax Court of the United States, 1959, 32 T.C. 469, which ordered and decided that there were no deficiencies in income tax for the taxable years 1948, 1950, 1953 and 1954. The proceedings in the Tax Court were instituted by the respondent to review a determination by the Commissioner of Internal Revenue that respondent had an income tax deficiency of $57,553.88 for the tax years above noted. The Tax Court held that the respondent was organized and operated exclusively for charitable purposes within the meaning of the statute, and that respondent is entitled to exemption from tax during the years in question.

The Tax Court had jurisdiction to review the Commissioner's determination of income tax deficiencies under Section 7442 of the Internal Revenue Code of 1954, 26 U.S.C. § 7442. Jurisdiction of this Court to review is conferred by Section 7482 of the Internal Revenue Code of 1954, 26 U.S.C. § 7482.

This is the second time that the tax exempt status of respondent charitable trust has been involved in litigation in this Court. The first litigation, decided adversely to the trust respondent by the Tax Court, 18 T.C. 454, 1952, was affirmed by this Court, 9 Cir., 1955, 231 F.2d 673, one Judge dissenting. Certiorari was denied 1956, 352 U.S. 828, 77 S.Ct. 43, 1 L.Ed.2d 50.

The facts before the Tax Court were all stipulated and found as stipulated, which included the findings of fact in the prior litigation.

The facts relevant to this review are as follows: The John Danz Charitable Trust, hereinafter referred to as the Trust, is an irrevocable trust created by agreement executed December 31, 1942, between John and Jessie Danz (husband and wife), as grantors, and John Danz, Fred and William Danz, as trustees. [The latter two are children of the grantors.] At the time of the creation of the trust the grantors transferred to the trust shares of common stock in a corporation.

The trust filed fiduciary income tax returns for the years here involved with the District Director at Tacoma, Washington.

During the years involved in the prior case, 1943 to 1947, inclusive, the trust operated two businesses which accounted for the larger part of the income of the trust. The most substantial one of these businesses was the Savoy Hotel in the City of Seattle, including furniture and fixtures therein, owned by the trust and operated by it from the date of its acquisition, September 15, 1943, until January 1, 1948. During that period, the trust received business income and incurred business expenses in connection with its operation of the hotel. The average of the annual gross receipts from the Savoy Hotel for the years 1943 through 1947 was approximately $141,000, the operating expenses approximately $96,400, and the net income approximately $44,600. The intention of the trustees in purchasing the Savoy Hotel property in 1943 was to operate it, through a real estate company as agent, only until the personal property could be sold and the real property leased to a hotel operator.

By lease effective January 1, 1948, the trust leased the Savoy Hotel to Northwest Operating, Inc., a hotel operator. The lease was for a term of ten years, commencing January 1, 1948. The rental provided for the hotel was a minimum

monthly rental of $1,800, together with 25 per cent of the gross income derived from hotel operations in excess of $7,200 per month. With respect to the store space in the building, the lease provided a minimum monthly rental of $500, together with 75 per cent of the gross income derived from its subrental. Northwest Operating, Inc. simultaneously purchased from petitioner the furniture and equipment in the Savoy Hotel for the price of $60,000. The trust simultaneously assigned to Northwest Operating, Inc., its lessor's interest in a five-year lease of a certain storeroom and its lessor's interest in month-to-month tenancies of certain other storerooms, all located in Seattle, Washington. Neither the grantors nor any of the trustees of the trust had or have an interest in Northwest Operating, Inc. The sale price of the furniture and fixtures and the rental agreement for the hotel property were reasonable.

The other business operated by the trust during the years at issue in the prior case involved three retail candy shops. One of these was acquired on September 10, 1943, for $1,514.75, another on September 22, 1943, for $875, and a third on January 31, 1944, for $1,500. The total sales of the candy shops from 1943 through 1947 were $329,233.95, net sales $158,689.10, and expenses $106,435.75. The total net profit from the operation for the same period was $52,650.44. The candy stores were operated in 1948 with net sales of $22,666.95 and a net profit of $1,384.29. Each candy shop was adjacent to a theater owned or managed by Sterling Theaters, Inc. Jessie [wife of donor] managed the three candy shops without pay because she wanted to make a contribution in that fashion to the acquisition of funds for the trust.

The candy shops were all sold by the trust in June, 1949.

No amendments were made to the trust agreement creating the trust during the years involved in the prior case. However, two amendments were made during the period here involved. On June 15, 1948, an amendment provided that "No funds of these trusts may be loaned directly or indirectly to grantors or either of them." In fact, neither prior to that amendment nor subsequent thereto have any of the funds of the trust been loaned directly or indirectly to the grantors. On March 21, 1949, a further amendment was made to the trust agreement adding the Seattle Trust & Savings Bank, a national banking corporation of Seattle, Washington, as a fourth trustee of the trust. This amendment stated that none of the powers of the trustees of the trust shall be exercised except with the affirmative approval of the Seattle Trust & Savings Bank or unless the bank is one of the trustees voting in favor of the action.

John, William and Fred served as trustees of the trust from the time of its inception until March 21, 1949, at which time the Seattle Trust & Savings Bank was added as trustee by the second amendment described above. These four trustees served until May 21, 1952, when Albert D. Walderon was elected as an additional trustee in place of William, who resigned. The trust has paid no compensation to any of the trustees with the exception of the Seattle Trust & Savings Bank which received compensation in accordance with its usual fee schedule for acting as trustee of trusts of this type. John and Jessie are not stockholders, directors, officers or otherwise interested in Seattle Trust & Savings Bank.

No part of the income or principal of the trust has inured directly or indirectly to the benefit of the grantors, John and Jessie. No joint investments nor any commingling of assets or income have been made with any other trusts created under the trust instrument or with any other person, trust or corporation.

The investments of the trust during each of the years in issue in the instant case consisted entirely of listed securities (except for the donated stock of Sterling Theaters, Inc., which was only a small part of the total outstanding stock of that corporation and played no part.

in the control or management of the corporation) and improved real property. Two of the four pieces of real property held by petitioner through 1949, and three of the four pieces of real property held from 1950, were for the primary use of the Humanist Societies of Washington, San Francisco and Los Angeles. In 1948, the trust also had inventories of $1,659.03 and equipment costing $5,312.-92 in connection with the three small candy stores operated by the trust until they were sold in June, 1949.

The net worth of the trust was $65,-862.62 at the end of 1943, $448,420.09 at the end of 1947, $500,070.25 at the end of 1948, and $451,646.79 at the end of 1954. The accumulated net income from the beginning of the trust in 1943 to the end of the year 1947 was $338,888.75, to the end of 1948, $390,528.25; however, at the end of 1954 it had decreased to $273,879.79. Capital gains accounted for $246,999.73 of the accumulated net income from the beginning of the trust in 1943 through 1954; capital gains for the years 1948 through 1954 amounted to $198,346.25. For the seven years 1948 through 1954, there was a decrease in accumulated net income.

The net income during the years before us consisted entirely of rents, dividends, interest and gains on sales of securities and real property, except for the year 1948 when $1,384.29 net profit was received from the operation of the three candy stores.

The investment activity of the trust consisted of seven purchases of various stocks during the year 1948; the purchase of the Hoover Street property in Los Angeles for the Humanist Society of Los Angeles, and one stock purchase, and the sale of one piece of real property and three stocks during 1950; no purchases or sales during 1953; and twelve stock purchases and six stock sales during 1954. All capital transactions were long term.

The trust has not made any purchase of securities or other property for more than an adequate consideration in money or money's worth. All purchases have been from outside persons and have constituted arms-length transactions. Securities have been purchased on the public stock exchanges. No securities or other property have been purchased from John or Jessie.

The trust has not sold any part of its securities or other property for less than an adequate consideration in money or money's worth. All stocks have been sold on the public stock exchanges. All real estate has been sold to outsiders at its fair market value or leased to outsiders for a reasonable rental. No securities or other property of the trust have been sold or otherwise transferred to John or Jessie.

Payments of compensation by the trust have not been in excess of a reasonable allowance for necessary personal services actually rendered to the trust in connection with the investment and management of its properties and the donations of its funds to charitable, educational and religious organizations.

Donations to the trust for the years 1948 through 1954 by John and others totaled $68,225, while donations by the trust to charity for the same period totaled $137,218.89; donations by the trust hence exceeded donations to the trust by $68,993.89. In the years 1948, 1950, 1953 and 1954, donations to the trust totaled $36,300 while donations by the trust to charity were $52,696.56. Over the entire period of the trust from 1943 through 1954, donations to the trust have totaled $177,767, while donations to charity by the trust have totaled $202,856.43. Thus, an excess in the amount of $25,-089.43 has been donated to charity by the trust over donations received by the trust.

Of the amount of $202,856.43 of total donations by the trust from 1943 through 1954, $170,058.89 was donated to or expended for the various Humanist Societies supported by the trust. Of $137,-218.89 donated by the trust from 1948 through 1954, $123,383.89 was donated to the Humanist Societies. In addition, the Humanist Society of Washington used a large portion of the Sixth and University

building owned and maintained by the trust; the Humanist Society of San Francisco until 1951 occupied a building in San Francisco owned and maintained by the trust; and the Humanist Society of Los Angeles from 1950 occupied a building owned and maintained by the trust at 23rd and Hoover Streets in Los Angeles. The Humanist Societies of Washington and San Francisco are exempt organizations. The Humanist Society of Los Angeles does not itself possess an exemption certificate, but has been financed to a great extent by the Humanist Society of Seattle, an exempt organization.

All donations made by the trust during the years 1948, 1950, 1953 and 1954 were to organizations exempt from income tax under section 101 of the 1939 Code, 26 U.S.C. § 101 or section 501 of the 1954 Code, 26 U.S.C. § 501, contributions thereto being deductible under section 23(o) or 170, bequests thereto being exempt from estate taxes under section 812 (d) or 2055, and gifts thereto being exempt from gift taxes under sections 1004 or 2522.

The trust has not engaged in any activities to influence legislation or carry on propaganda, nor has it participated in or intervened in any political campaign on behalf of any candidate for public office in any manner whatsoever.

Books and records for the trust are kept by the trustees at the Palomar Building, Seattle, Washington. The receipts, income, funds, property and disbursements of the trust have been separately and fully accounted for and the books and records are complete as to all transactions and clearly reflect those transactions and the status of the accounts. The trust maintained separate bank accounts. Title to all of the assets of the trust has been taken in the name of the trustees.

Based on the foregoing record, the Tax Court held that the trust "was not a business operating 'feeder' and was organized and operated exclusively for charitable purposes within the meaning of the statute during the taxable years in question."

On this appeal the petitioner, hereinafter referred to as the Commissioner, urges alternative contentions: first, that since the prior litigation determined that the trust was not tax exempt for the years therein involved that the Tax Court erred in failing to deem itself bound, under the doctrine of collateral estoppel, by the result of the prior litigation; second, that even though the doctrine of collateral estoppel should be found to be inapplicable the Tax Court erred in holding on the merits of the issue that the trust was organized and operated exclusively for charitable purposes.

The statutes cited as relevant by the parties under the Internal Revenue Codes of 1939 and 1954 are set forth in the appendix to this opinion.

Both the language of Section 101 (6) of the Internal Revenue Code of 1939 and Section 501(c) (3) of the Internal Revenue Code of 1954 provide that there will be exempted from tax those organizations which are "organized and operated exclusively for * * *, charitable, * * * purposes." Hence, there are two requirements for exemption— that the organization be both *organized* and *operated* exclusively for charitable purposes. The lack of either requirement is fatal to tax exempt status. Universal Oil Products Co. v. Campbell, 7 Cir., 1950, 181 F.2d 451, certiorari denied 1950, 340 U.S. 850, 71 S.Ct. 78, 95 L.Ed. 623 and cases cited therein.

The Commissioner does not contend in his briefs filed in this Court, nor did he contend on oral argument, that the trust did not operate for the years involved here exclusively for charitable purposes. In light of the stipulation of facts and the findings of the Tax Court such contention would be without substance. Furthermore, the Commissioner concedes that "The facts show that in the years presently before this Court there has been a change in the manner in which this trust has been operated, and we must admit that insofar as the operation

of a trust is significant in determining tax exemption, collateral estoppel does not apply to bar the action."

Thus, the only real issue presented on this appeal is whether the trust was organized exclusively for charitable purposes. If the trust was not organized exclusively for charitable purposes, it is not entitled to a tax exempt status irrespective of its mode of operation. Sun-Herald Corp. v. Duggan, 2 Cir., 1934, 73 F.2d 298, certiorari denied 1935, 294 U.S. 719, 55 S.Ct. 546, 79 L.Ed. 1251; Sun-Herald Corp. v. Duggan, 2 Cir., 1947, 160 F.2d 475.

We now consider the Commissioner's contention that the findings of the Tax Court that the trust was organized exclusively for charitable purposes is erroneous because of the failure of the Tax Court to apply the doctrine of collateral estoppel which it is claimed arises from the prior decision of this Court in 231 F.2d 673.

The general principles of collateral estoppel are applicable to federal income taxation. Tait v. Western Maryland Railway, 1933, 289 U.S. 620, 53 S. Ct. 706, 77 L.Ed. 1405.[1] Commissioner of Internal Revenue v. Sunnen, 1948, 333 U.S. 591, 68 S.Ct. 715, 718, 92 L.Ed. 898.

The meaning and scope of the doctrines of res judicata and collateral estoppel were outlined by the Supreme Court of the United States in Commissioner of Internal Revenue v. Sunnen, supra, wherein the Court stated:

"The general rule of *res judicata* applies to repetitious suits involving the same cause of action. It rests upon considerations of economy of judicial time and public policy favoring the establishment of certainty in legal relations. The rule provides that when a court of competent jurisdiction has entered a final judgment on the merits of a cause of action the parties to the suit and their privies are thereafter bound 'not only as to every matter which was offered and received to sustain or defeat the claim or demand, but as to any other admissible matter which might have been offered for that purpose.' Cromwell v. County of Sac, 94 U.S. 351, 352 [24 L.Ed. 195]. The judgment puts an end to the cause of action, which cannot again be brought into litigation between the parties upon any ground whatever, absent fraud or some other factor invalidating the judgment. See Von Moschzisker, 'Res Judicata,' 38 Yale L.J. 299; Restatement of the Law of Judgments, §§ 47, 48.

"But where the second action between the same parties is upon a different cause or demand, the principle of *res judicata* is applied much more narrowly. In this situation, the judgment in the prior action operates as an estoppel, not as to matters which might have been litigated and determined, but 'only as to those matters in issue or points controverted, upon the determination of which the finding or verdict was rendered.' Cromwell v. County of Sac, supra, [94 U.S.] 353. And see Russell v. Place, 94 U.S. 606 [24 L.Ed. 214]; Southern Pacific R. Co. v. United States, 168 U.S. 1, 48 [18 S. Ct. 18, 42 L.Ed. 355]; Mercoid Corp. v. Mid-Continent [Inv.] Co., 320 U.S. 661, 671 [64 S.Ct. 268, 88 L.Ed. 376]. Since the cause of action involved in the second proceeding is not swallowed by the judgment in the prior suit, the parties are free to litigate points which were not at issue in the first proceeding, even though such points might have been tendered and decided at that time. But matters which were actually litigated and determined the first proceeding cannot later be relitigated. Once a party has fought out a matter in litigation with the other party, he cannot later renew

[1] Cases on this subject are collected in 150 A.L.R. 5, supplemented in 162 A.L.R. 1204.

that duel. In this sense, *res judicata* is usually and more accurately referred to as estoppel by judgment, or collateral estoppel. See Restatement of the Law of Judgments, §§ 68, 69, 70; Scott, 'Collateral Estoppel by Judgment,' 56 Harv.L.Rev. 1.

"These same concepts are applicable in the federal income tax field. Income taxes are levied on an annual basis. Each year is the origin of a new liability and of a separate cause of action. Thus if a claim of liability or non-liability relating to a particular tax year is litigated, a judgment on the merits is *res judicata* as to any subsequent proceeding involving the same claim and the same tax year. But if the later proceeding is concerned with a similar or unlike claim relating to a different tax year, the prior judgment acts as a collateral estoppel only as to those matters in the second proceeding which were actually presented and determined in the first suit. Collateral estoppel operates, in other words, to relieve the government and the taxpayer of 'redundant litigation of the identical question of the statute's application to the taxpayer's status.' Tait v. Western Md. R. Co., 289 U.S. 620, 624 [53 S.Ct. 706, 707, 77 L.Ed. 1405]."

It is obvious that the cause of action in the prior litigation is a different cause of action than the one involved in the proceedings now under review. Hence we must apply the doctrine or principle in the narrower way stated by the Supreme Court.

We have examined the record before the Tax Court in the initial litigation, and we entertain a grave doubt that the tax exemption was denied the trust because it was not organized exclusively for charitable purposes. In our view, tax exemption was denied in the years therein in question because of the operation by the trust of two profitable businesses. Such is also the view of the Tax Court in the present proceedings. In any

event, it is clear to us that in our prior decision we did not rely upon the claim or contention that the trust was not organized exclusively for charitable purposes to support the initial decision of the Tax Court. An analysis of the briefs filed with us in the prior litigation clearly discloses that the arguments pressed upon us related to the character of the operation of the trust for the years therein involved and not to its organizational purposes. Furthermore, a close analysis of our earlier opinion reveals that the tax exemption was denied solely on the ground that, by reason of its business operations, the trust during those years was not being operated exclusively for charitable purposes. In our earlier opinion, with regard to exemption under Section 101(6) of the Internal Revenue Code of 1939, we stated in the majority opinion, 231 F.2d at page 675:

"So far as the claim of exemption under § 101(6) of the Code is concerned, the case is ruled by our opinion in Ralph H. Eaton Foundation v. Commissioner of Internal Revenue, 9 Cir., 219 F.2d 527, at pages 528–529:

" 'The articles state that the purpose of the corporation is to foster and promote religious, charitable and educational enterprises, and that it does not contemplate pecuniary gain or profit to the members thereof. Clearly, however, the corporation itself was not intended to operate and did not operate as a religious, educational or charitable institution. What was purposed was only that the profits from its various business activities would be turned over to such institutions. In a word, petitioner is a "feeder" corporation whose principal activities have not the remotest connection with any religious, charitable or educational enterprise.'

"and again:

" 'The record shows that it engaged actively and exclusively in various commercial or business en-

terprises, namely farming, selling of real estate lots, the selling of sport clothes, and in a construction business. * * * All of the latter had to be and were engaged in activities which carried out the purposes and ideas for which petitioner had been established. * * * But assuming the function of turning over the profits was an activity or operation it certainly was not the principal one. We agree with the Fourth Circuit [United States v. Community Services, 189 F.2d 421] that the word "exclusively" as used in the statute must be given effect.'"

Tax exemption was denied in the Eaton case because the foundation therein involved was not being operated exclusively for charitable purposes since business operations were its principal activity. At no place in our earlier opinion in the Danz Trust case did we state directly or indirectly that the trust was not organized exclusively for charitable purposes.

We hold that there is no error on the part of the Tax Court in refusing to apply the doctrine of collateral estoppel claimed to arise from our prior decision.

We will now consider the Commissioner's final contention that the Tax Court erred in finding and holding that the trust was organized exclusively for charitable purposes.

■ In determining the meaning of the word "organized" as used in the income tax exemption provisions set out in the Appendix, it has been held that such word refers to the creation or establishment of the structure of the charitable entity, rather than to the actual activities of the entity. Sun-Herald Corp. v. Duggan, 73 F.2d 298, supra; Sebastian-Lathe Co. v. Johnson, D.C.S.D. N.Y.1952, 110 F.Supp. 245; Samuel Friedland Foundation v. United States, D.C.D.N.J.1956, 144 F.Supp. 74. However, in searching for the intentions or motives behind the structure of a charitable entity, a court may look beyond the four corners of the creating instrument and may consider extrinsic evidence on this subject where it is helpful. Sun-Herald Corp. v. Duggan, 160 F.2d 475, supra.[2]

■ The trust was created on December 31, 1942. No business activities of any kind were transferred to the trust at that time nor was any business then acquired. The assets of the trust initially consisted of shares of corporate stock. The Tax Court found in the prior litigation that John Danz concluded "during the latter part of World War II that different ideologies were causing a great deal of trouble and even had a tendency to create wars; the country was about ready for some philosophy with some common ground acceptable to everyone based upon science, pragmatism, experience and research that would eliminate all differences of opinion; but to get such an organization started in a large number of communities would require money. He and his wife created a trust on December 31, 1942 for the purpose of making and supplying money for that purpose. They called it 'The John Danz Charitable Trust.' John hoped to find some organization in the United States with a number of branches which could be helped with the trust funds to grow and educate the people. He did not know of any such organization at the time he created the trust and for that reason reserved in the trust the right to designate the charitable beneficiaries of the trust. * * *

"John Danz, after the creation of the trust, continued, at his own expense, to search for the type of organization which he had in mind in forming the trust, and after several years of travel and search he decided that there were groups of Humanists which came close to what he had in mind. He was instrumental with others in starting such an organization in Seattle, beginning in the early part of 1947. It was incorporated as the Humanist Society of Washington. Prior thereto

---

2. Cases are collected in 69 A.L.R. 871–875.

and beginning in September 1946, he had designated 'American Humanist Society,' an organization which had a number of affiliates in different parts of the United States, as a beneficiary to receive funds of the trust in the total amount of $11,-500. He was also instrumental, along with others, in starting the Humanist Society of San Francisco and, after the taxable years, in starting the Humanist Society of Los Angeles."

We are satisfied from the record that the motive, purpose and intention of Mr. and Mrs. Danz was to create or organize an entity exclusively for charitable purposes.

By its terms the trust is irrevocable, but can be amended in certain respects, but this power to amend does not include the power to change the beneficiaries or to make a change which would in any way benefit the grantors or their estates. John Danz is to have the right during his lifetime and by his will to designate the beneficiary or beneficiaries of the trust, and to change, add or withdraw beneficiaries which are to receive corpus or income of the trust at times and in amount specified by him. If the grants to exempt organizations made by the trust during John Danz' lifetime do not exhaust the trust, then at his death the balance goes to the exempt organizations designated either in his will, or by the trustees or by his grandchildren, as the case may be. Designations must be in writing delivered to the trustees. Only a corporation or organization "of a type which is within the exemption from Federal Income Tax now granted by Paragraph 101 of the Internal Revenue Code and in the event such exemption is hereafter restricted, then also within such restriction" can be designated, and the beneficiary also must be of the type then specified in paragraphs 23(o), 812(d), and 1004(a) (2) of the Internal Revenue Code, so that the contribution, bequest or gift to such beneficiary will be deductible from income and exempt from estate and gift tax and in the event those classes are further restricted, then the bene-

ficiary must be within those restrictions. The only amendments made to the trust during the years here involved are the two set forth in the earlier part of this opinion.

The Commissioner calls attention to the fact that broad powers are given to the trustees to conduct business and to the fact that the trust during the years involved in the prior litigation operated candy stores and a hotel. From those facts the Commissioner argues that the finding and holding of the Tax Court that the trust was organized exclusively for charitable purposes is clearly erroneous. We do not agree. The Commissioner erroneously equates powers of the trustees to purposes of the trust. The existence of broad powers in the trustees to administer the trust does not compel a finding or holding that the trust was not organized exclusively for charitable purposes. Admittedly through the tax years under review the trust operated exclusively for charitable purposes. The fact that the operations of the trust were different in the years involved in the prior litigation, likewise, does not compel a finding or holding that the trust was not organized exclusively for charitable purposes.

We have examined United States v. Community Service, 4 Cir., 189 F.2d 421, certiorari denied 342 U.S. 932, 72 S.Ct. 375, 96 L.Ed. 694; Sun-Herald Corp. v. Duggan, 73 F.2d 298, supra; Sun-Herald Corp. v. Duggan, 160 F.2d 475, supra; Universal Oil Products Co. v. Campbell, supra; Duffy v. Birmingham, 8 Cir., 190 F.2d 738; Boman v. Commissioner, 8 Cir., 240 F.2d 767, 69 A.L.R.2d 864; Bear Gulch Water Co. v. Commissioner, 9 Cir., 116 F.2d 975, certiorari denied 314 U.S. 652, 62 S.Ct. 99, 86 L.Ed. 523; and Roche's Beach, Inc. v. Commissioner, 2 Cir., 96 F.2d 776, relied upon by the Commissioner, and we find them inapposite. In several of such cases the corporation was originally organized for the purpose of operating a business for private profit. Exemption was denied because the subsequently formed charita-

ble purpose could not retroactively change the original purposes of organization. In other of such cases exemption was denied because of substantial business operations in the years involved.

We hold, under the record in this case, that the finding and holding of the Tax Court that the trust was organized exclusively for charitable purposes is not clearly erroneous. Accordingly, the decision of the Tax Court is affirmed.

### Appendix

Internal Revenue Code of 1939:

"Sec. 101 [As amended by Sec. 301 (b) of the Revenue Act of 1950, c. 994, 64 Stat. 906, and Sec. 314(b) (1) of the Revenue Act of 1951, c. 521, 65 Stat. 452].

"Exemptions from tax on corporations.

"Except as provided in paragraph (12) (B) and in supplement U,[1] the following organizations shall be exempt from taxation under this chapter— * * *

"(6) [as amended by Sec. 332(c), Revenue Act of 1950, supra] Corporations, and any community chest, fund, or foundation, organized and operated exclusively for religious, charitable, scientific, literary, or educational purposes, or for the prevention of cruelty to children or animals, no part of the net earnings of which inures to the benefit of any private shareholder or individual, and no substantial part of the activities of which is carrying on propaganda or otherwise attempting, to influence legislation. For loss of exemption under certain circumstances, see sections 3813 and 3814;[2]

* * * * * *

"(14) Corporations organized for the exclusive purpose of holding title to property, collecting income therefrom, and turning over the entire amount thereof, less expenses, to an organization which itself is exempt from the tax imposed by this chapter;

* * * * *

"An organization operated for the primary purpose of carrying on a trade or business for profit shall not be exempt under any paragraph of this section on the ground that all of its profits are payable to one or more organizations exempt under this section from taxation. For the purposes of this paragraph the term 'trade or business' shall not include the rental by an organization of its real property (including personal property leased with the real property).[3]

"Notwithstanding paragraph (12) (B) and supplement U, an organization described in this section (other than in the preceding paragraph) shall be considered an organization exempt from income taxes for the purpose of any law which refers to organizations exempt from income taxes. * * *" 26 U.S.C. 1952 ed. § 101.

Supplement "U" of the Internal Revenue Code of 1939 (added by Sec. 301(a), Rev.Act of 1950, c. 994, 64 Stat. 947):

"Supplement U—Taxation of Business Income of Certain Section 101 Organizations

"§ 421. Imposition of tax.

"(a) In general.—There shall be levied, collected, and paid for each taxable year beginning after December 31, 1950—

---

1. The phrase "Except as provided in supplement U" was added by the Revenue Act of 1950, effective for taxable years beginning before January 1, 1951. The phrase "Except as provided in paragraph (12) (B) and in supplement U" was added by the 1951 Act.

2. The last sentence was added by the 1950 Act, effective for taxable years beginning after December 31, 1950.

3. This paragraph was added by the 1950 Act, effective for taxable years beginning after December 31, 1950.

\* \* \* \* \* \*

"(2) upon the supplement U net income of every trust described in subsection (b) (2), a normal tax computed at the rate and in the manner provided in section 11 and a surtax computed at the rates and in the manner provided in section 12 (b). \* \* \*

"(b) Organizations subject to tax.—

\* \* \* \* \* \*

"(2) Trusts taxable at individual rates.—The taxes imposed by subsection (a) (2) shall apply in the case of any trust which is exempt, except as provided in this supplement, from taxation under this chapter by reason of paragraph (6) of section 101 and which, if it were not for such exemption, would be subject to the provisions of supplement E.

"(c) Definition of supplement U net income.—The term 'supplement of net income' of an organization means the amount by which its unrelated business net income (as defined in section 422) exceeds $1,000.

\* \* \* \* \* \*

"§ 422. Unrelated business net income

"(a) Definition.—The term 'unrelated business net income' means the gross income derived by any organization from any unrelated trade or business (as defined in subsection (b) regularly carried on by it, \* \* \*."

Internal Revenue Code of 1954:

"Sec. 501. Exemptions from tax on corporations certain trusts, etc. \* \* \*

"(c) List of exempt organizations.—The following organizations are referred to in subsection (a): \* \* \*

"(2) Corporations organized for the exclusive purpose of holding title to property, collecting income therefrom, and turning over the entire amount thereof, less expenses, to an organization which itself is exempt under this section.

"(3) Corporations, and any community chest, fund, or foundation, organized and operated exclusively for religious, charitable, scientific, testing for public safety, literary, or educational purposes, or for the prevention of cruelty to children or animals, no part of the net earnings of which inures to the benefit of any private shareholder or individual, no substantial part of the activities of which is carrying on propaganda, or otherwise attempting to influence legislation, and which does not participate in, or intervene in (including the publishing or distributing of statements), any political campaign on behalf of any candidate for public office. \* \* \*" 26 U.S.C. 1958 ed., § 501.

"Sec. 502. Feeder organizations.

"An organization operated for the primary purpose of carrying on a trade or business for profit shall not be exempt under section 501 on the ground that all of its profits are payable to one or more organizations exempt under section 501 from taxation. For purposes of this section, the term 'trade or business' shall not include the rental by an organization of its real property (including personal property leased with the real property)." 26 U.S.C. 1958 ed., § 502.

"Part II—Taxation of Business Income of Certain Exempt Organizations

"§ 511. Imposition of tax on unrelated business income of charitable, etc., organizations.

\* \* \* \* \* \*

"(b) Tax on charitable, etc., trusts.—

"(1) Imposition of Tax.—There is hereby imposed for each taxable

year on the unrelated business taxable income of every trust described in paragraph (2) a tax computed as provided in section 1. In making such computation for purposes of this section, the term 'taxable income' as used in section 1 shall be read as 'unrelated business taxable income' as defined in section 512.

"(2) Charitable, etc., trusts subject to tax.—The tax imposed by paragraph (1) shall apply in the case of any trust which is exempt, except as provided in this part, from taxation under this subtitle by reason of section 501(c) (3) or section 401(a) and which, if it were not for such exemption, would be subject to subchapter J (sec. 641 and following, relating to estates, trusts, beneficiaries, and decedents).

\* \* \* \* \* \*

"§ 512. Unrelated business taxable income.

"(a) Definition.—The term 'unrelated business taxable income' means the gross income derived by any organization from any unrelated trade or business (as defined in section 513) regularly carried on by it, \* \* \*.

"§ 513. Unrelated trade or business.

"(a) General rule.—The term 'unrelated trade or business' means, in the case of any organization subject to the tax imposed by section 511, any trade or business the conduct of which is not substantially related (aside from the need of such organization for income or funds or the use it makes of the profits derived) to the exercise or performance by such organization of its charitable, educational, or other purpose or function constituting the basis for its exemption under section 501 (or, in the case of an organization described in section 511(a) (2) (B), to the exercise or performance of any purpose or function described in section 501(c) (3), \* \* \* "