Real Estate Corporation, Inc. v. Commissioner.
Real Estate Corp. v. Commissioner
Docket No. 83342.
United States Tax Court
T.C. Memo 1963-138; 1963 Tax Ct. Memo LEXIS 205; 22 T.C.M. (CCH) 654; T.C.M. (RIA) 63138; May 22, 1963
N. E. Snyder, 206 Brotherhood Block, Kansas City, Kan., for the petitioner. Edward E. Pigg, for the respondent. DAWSON
Memorandum Findings of Fact and Opinion DAWSON, Judge: Respondent determined *206 deficiencies in the income tax of petitioner as follows: Year
Deficiency
1953
$19,418.54
1954
5,086.18
1955
11,928.64
1956
29,743.16
Certain adjustments have been stipulated by the parties. The issues remaining for determination are: 1. Whether petitioner is estopped by the judgment in a proceeding involving the same issue for prior years. 2. Whether petitioner is entitled to capital gains treatment on the sales of unimproved real estate. 3. Whether amounts paid on petitioner's own property at sheriff's sales are deductible as taxes. 4. To what extent the proceeds from involuntary conversions have been reinvested in similar properties within the statutory period. Findings of Fact Some of the facts have been stipulated and are so found. The stipulation of facts and exhibits attached thereto are incorporated herein by reference. *
*207 Real Estate Corporation, Inc., (hereinafter referred to as petitioner) with its principal office during the years in issue at 700 Central Avenue, Kansas City, Kansas, was incorporated under the laws of the State of Kansas on January 19, 1949. Petitioner filed its corporation income tax returns for the years involved with the district director of internal revenue, Wichita, Kansas. Appropriate consents extending the period of limitations for the assessment of income taxes have been executed for the years 1953, 1954, and 1955. Petitioner keeps its books and files its income tax returns on the cash method of accounting on a calendar year basis. *
The City of Kansas City, Kansas, paid for certain public improvements by issuing tax bills to contractors who would sell them to obtain money to finance their operations. These tax bills became liens on the properties which were subject to assessment for taxes. If the taxes were not paid, the properties were sold for taxes. Riverview State Bank (hereinafter referred to *208 as Riverview) purchased several hundred thousand dollars worth of these tax bills. When owners of tracts of land failed to pay the taxes levied against their property, the land was sold at tax sales and to protect its investment in these tax bills, Riverview purchased land at such sales. Since banks are forbidden by Kansas law to hold or own real estate, State and Federal bank examiners objected to these purchases. To divest itself of these holding, Riverview formed General Securities Corporation, a wholly owned subsidiary, to hold these certificates and lands. When bank examiners objected to this arrangement, a group of persons, with one exception stockholders of Riverview, formed petitioner to hold the lands acquired at tax sales. Petitioner purchased all the assets of General Securities Corporation, giving its note in the amount of $23,944.02. The number of lots thus acquired was between 1,000 and 2,000. Fifty percent of the original lots acquired are still owned by petitioner, whose articles of incorporation provide that the nature of its business includes buying, selling, owning, or improving real estate. During 1953 through 1956, petitioner engaged in the following transactions, *209 excluding involuntary conversions, losses of property at tax sales, and redemptions of property at tax sales: Purchases
Purchases
Trans-
Trans-
Year
actions
Lots [1]
actions
[1] Lots 1953
5
21
10
25
1954
12
58
6
19
1955
4
14
6
37
1956
3
10
8
25
Net
Purchases
Sales
Reported
Income
Net
Net Profit
from Realty
Proceeds
from Rental
Sales as %
(proceeds
and Misc.
of Total
Year
Proceeds
less cost)
Income
[2] Income 1953
$ 7,010.00
$ 6,945.00
$15,012.84
30.0
1954
7,321.85
7,176.85
13,101.97
33.2
1955
16,600.00
13,464.56
19,389.79
40.1
1956
12,100.00
12,100.00
26,212.69
31.6
The properties involved were unimproved and scattered generally throughout the city. Some of the lots sold were located in an area that was severely flooded in 1951. In carrying on its activities petitioner maintained no separate office but used the address and place of business of Riverview. It paid no salaries, no rent, no dividends, and maintained no listings in any phone directory or in the Polk City *210 directory. Petitioner is not a licensed real estate broker or agent. No soliciting of customers by newspaper advertising, handbills, or "For Sale" signs was done by petitioner. Purchasers who contacted petitioner were frequently customers of Riverview, adjacent landowners, or persons who had searched the tax records. Petitioner usually attempted to lease the properties but for various reasons was unable to do so and sold them instead. None of the properties that were sold were improved. Taxes were paid on only five of the properties, two of which were sold under threat of condemnation. With few exceptions, petitioner paid no taxes on properties acquired at tax sales. During the years in issue, there were between 40 and 50 leases in effect on properties owned by petitioner. About half of these were billboard leases providing for rentals averaging $45 per year and for termination upon 30 days' notice in the event petitioner sells the land. Some of the leases were on properties acquired at tax sales. While some of the tax sales properties were improved when received from General Securities and have been rebuilt and further improved while in petitioner's hands, no properties which *211 were vacant when acquired have been improved. Buildings which were built during the years in issue were built on land purchased from individuals. Petitioner's improved and leased properties were separated on its books from the unimproved properties purchased at tax sales. Petitioner does not pay real estate taxes on all of the real estate which it has acquired at tax sales because the amount of such would be prohibitive. Between 30 and 40 unimproved lots were lost at tax sales during 1953 and 1956. On five occasions during the years involved, petitioner made payments in amounts necessary to outbid other persons at sheriff's sales of petitioner's properties upon which taxes were delinquent. These transactions involved approximately $14,000 and some 150 to 200 lots. If the payment exceeded the amount of taxes, interest, penalties, and charges due on a piece of property, the excess amount was returned to petitioner. There is no provision under Kansas law for the compromise of taxes, such a provision having been repealed in 1941. During the years 1953 through 1956, approximately 60 lots and partial lots were sold through condemnations or threats of condemnations to Santa Fe Railroad, *212 Union Pacific Railroad, Kansas City Southern Railroad, Kansas Turnpike Authority, Missouri Pacific Railroad, and the City of Kansas City, Kansas. All of the properties condemned were unimproved realty. The proceeds from the involuntary conversions for each year, the amounts reinvested in other unimproved properties within the statutory period, and the amounts not reinvested within the statutory period are as follows: Proceeds
Proceeds Not
Reinvested
Reinvested
Involuntary
Within
Within
Conversion
Statutory
Statutory
Proceeds
Period
Period
1953
$11,623.00
$10,476.30
$ 1,146.70
1954
1,096.20
1,096.20
0
1955
925.00
914.30
10.70
1956
26,365.00
515.00
25,850.00 The amounts reinvested do not include payments at sheriff's sales relating to property already held by petitioner. Ultimate Findings of Fact Petitioner was engaged in the business of holding real estate for investment purposes. It was also engaged in the business of holding unimproved land primarily for sale to customers in the ordinary course of business. Opinion The principal issue to be determined is whether petitioner held real property for sale to customers *213 in the ordinary course of its trade or business during the years 1953 through 1956. Petitioner contends that it held the lots for investment purposes and that it is entitled to capital gains treatment on their sale. Respondent, relying on section 1221(1) of the 1954 Code, [1][2] contends that the gains realized on the sale of such lots are taxable as ordinary income. In an earlier case involving the years 1950 through 1952, this Court sustained the Commissioner on the same issue. See Real Estate Corporation, Inc., 35 T.C. 610 (1961), affd. 301 F. 2d 423 (C.A. 10, 1962), certiorari denied 371 U.S. 822 (1962), rehearing denied *214 371 U.S. 917 (1962). Respondent asserts that the nature of petitioner's business, as established by the pleadings and the evidence adduced at the trial, is exactly the same as it was in the earlier case and, therefore, the petitioner is now estopped by judgment to deny that it was in the business of holding unimproved realty for sale. Petitioner's reliance on Fritz Thompson, 38 T.C. 153 (1962), on appeal (C.A. 5, 1962), is well placed. The issue in that case, involving the years 1956 through 1958, was identical to the issue here, i.e., whether property was held for sale in the ordinary course of business. The Court of Claims had decided the same issue for the years 1946 through 1949. In rejecting the Commissioner's contention that the taxpayer had the burden of showing that the character of the holding of the property had changed in the later years, we said: The fact that petitioner was so holding the lots in 1916 to 1949 is, of course, not conclusive as to how the property was held in the years 1956 to 1958, the years in which the sales that produced the gains involved herein, were made. In the leading case of Commissioner v. Sunnen, 333 U.S. 591 (1948), *215 the Supreme Court stated: where two cases involve income taxes in different taxable years, collateral estoppel must be used with its limitations carefully in mind so as to avoid injustice. It must be confined to situations where the matter raised in the second suit is identical in all respects with that decided in the first proceeding and where the controlling facts and applicable legal rules remain unchanged. While the issue in this case is identical to the issue in the prior case and the "applicable legal rules remain unchanged," the facts necessary to establish the nature of properties held by petitioner and thereby the nature of gains on the sale of such properties during the years involved in this case are different from those facts presented in the case involving prior years. Even though the nature of the properties may not have changed in the subsequent years, petitioner is not estopped from presenting the issue in this proceeding. Cf. Jackson v. King, 223 F. 2d 714 (C.A. 5, 1955), Journal-Tribune Publishing Co., 38 T.C. 733 (1962), on appeal (C.A. 8, *216 1962), and John Danz Charitable Trust, 32 T.C. 469 (1959), affd. 284 F. 2d 726 (C.A. 9, 1961). Petitioner argues again that the burden of proof in this proceeding has shifted to respondent because of errors in the 90-day letter and arbitrary and inconsistent positions taken by respondent. We find no merit in this argument and have previously denied petitioner's motion for a ruling to that effect. Whether realty is held for sale to customers in the ordinary course of one's trade or business is a question of fact. No one of the various criteria considered by the courts is decisive. Each case must be decided upon its particular facts and pattern. Respondent concedes, and we have so found, that petitioner is in the business of leasing improved real estate. We are convinced by the record as a whole, however, that petitioner also holds certain unimproved realty for sale in the ordinary course of its business. That one can be in the investment business and at the same time *217 hold other realty for sale is well-established. See King v. Commissioner, 189 F. 2d 122 (C.A. 5, 1951), affirming a Memorandum Opinion of this Court, certiorari denied, 342 U.S. 829 (1951); Eline Realty Company, 35 T.C. 1 (1960), acq. 1961-1 C.B. 4; and Charles E. Mieg, 32 T.C. 1314 (1959), acq. 1960-1 C.B. 5. Summarized, the arguments supporting petitioner's claim that the properties in question were capital assets are: (1) that the number of transactions during the years involved is substantially less than the amount of activity in the prior years; (2) that gross income from property sales has decreased almost 50 percent; (3) that there has been no advertising or solicitation on the part of petitioner; (4) that little time was spent by the officers of the corporation on its affairs; (5) that petitioner was not a licensed real estate agent or broker; and (6) that properties which were sold had lost their investment potential for one reason or another. Petitioner points to the decrease in sales activity for the years in controversy to show that the nature of its business has changed. It does not *218 follow, however, that the nature of the property in the hands of petitioner has changed. On the contrary, the evidence as to the frequency and continuity of sales shows that petitioner continues to hold unimproved realty for sale in the ordinary course of its business. For the years 1953 through 1956, petitioner had 30 sales transactions involving over 100 unimproved lots. And even though rental income has increased during those years, approximately one-third of petitioner's net income, which we view as a more valid comparison than gross income, is still derived from the sale of realty. Cf. Pennroad Corporation v. Commissioner, 261 F. 2d 325 (C.A. 3, 1958), affirming 29 T.C. 914 (1958), certiorari denied 359 U.S. 958 (1959). The lack of advertising is not significant where the circumstances render such unnecessary. Arthur E. Wood, 25 T.C. 468 (1955). Here petitioner's customer market consisted of the many customers of the bank, adjacent land owners, builders, real estate agents who had knowledge of its property holdings, and persons who were victims of the housing crisis created by the 1951 flood in the general area of much *219 of petitioner's property. Petitioner's president during these years was very active in flood relief activities, and his association with this project rendered advertising of petitioner's available properties less essential. It is argued that little time was spent on corporate affairs by the officers of the corporation. The determinative factor, however, is the total activity of petitioner through its officers. The evidence fails to show that the time devoted to buying and selling activities, such as locating and examining property, preparing bids for sheriff's sales and commissioners' sales, and handling sales to purchasers, did not constitute a substantial portion of petitioner's total corporate activities. Nor does the lack of a real estate license enhance petitioner's position since Kansas law does not require a person selling its own property to procure a license. Petitioner's own witnesses declared repeatedly that it was the intention of the corporation to hold the lots in question for investment purposes but that they would be sold "for one reason or another." Nevertheless, these actions in regard to the properties were in most respects inconsistent with the concept of investing. *220 We cannot overlook that petitioner has never improved vacant property acquired at a tax sale, that virtually no taxes are paid on such properties, that it has continued to buy similar properties in every year of its existence, that it would be financially impossible for petitioner to develop all of its property for investment, and that the frequency and continuity of sales controvert any inference of casual sales. We find these factors far more persuasive of petitioner's real intent than its own self-serving declarations. Many of the cases cited by petitioner deal with taxpayers who are in businesses or occupations unrelated to real estate and who get involved with sales of real estate on the side. This type of case readily lends itself to capital asset treatment on a liquidation theory. But where the taxpayer is already involved in real estate, as this petitioner, there are numerous cases holding that the taxpayer is engaged in the two-fold business of investing and selling. That this petitioner's business is two-fold is readily borne out by its articles of incorporation which provide that the nature of its business is "buying, selling, owning or improving real estate." Moreover, *221 it is clear that petitioner was not attempting to liquidate its holdings of the properties in question since it still holds over 50 percent of the original lots received and continues to acquire similar lots. The facts in this case are similar or identical in many respects to the facts in Curtis Co., 23 T.C. 740 (1955), affd. this issue 232 F. 2d 167 (C.A. 3, 1956). There the number of sales for the years in issue were 1, 6, 5, and 7 respectively, there was no advertising or soliciting, none of the land was subdivided or improved, the only rental income was a very negligible amount from billboard rentals, and the undeveloped land was recorded in a separate account. The following language from the opinion in that case is pertinent: It [taxpayer] attempts to explain the sales during the years in issue as unexpected, too profitable to refuse, and made for reasons of friendship, goodwill, or by condemnation. However, the essential fact seems to be that these properties were acquired for the purpose of resale whenever a satisfactory profit could be made. Petitioner may not have aggressively promoted the sale of these properties; but, nevertheless, the frequency *222 and volume of its sales of undeveloped real estate and its substantial holdings of such properties convince us that these properties were held, not only for sale at some time in the future, but primarily for sale to its customers in the ordinary course of its business during each of the years here in issue. Petitioner was a dealer in undeveloped land, and gains derived from the sale of such property are taxable as ordinary income. Viewing the record as a whole, we conclude that the same result must be reached here. Consequently, we sustain respondent's determination that petitioner held unimproved property for sale in the ordinary course of its business and that gains from the sales of such properties in the years 1953 through 1956 are taxable as ordinary income. The third issue is whether amounts paid by petitioner during these years at sheriff's sales for properties which it owned constitute the payment of taxes deductible under section 164(a) of the 1954 Code [3][4] or a capital expenditure for the repurchase of property. Respondent contends that there is no provision in Kansas law for *223 the compromising of real estate taxes, that petitioner lost title to the properties when they were "bid in" by the county, that petitioner did not redeem the properties before the sheriff's sales, and, therefore, the amounts paid at such sales represent petitioner's new bases for the properties. We cannot agree. It is well-established that the purchase at a tax sale by one whose duty it was to pay the taxes operates merely as a payment of such taxes. Gould v. Day, 94 U.S. 405 (1876); 85 C.J.S., sec. 809. The Supreme Court of Kansas has so held. Gibson v. Hornung, 110 Kan. 211, 203 P. 730 (1922); Purl v. Purl, 107 Kan. 314, 191 P. 297 (1920). Under the law of Kansas, petitioner remained liable for the taxes on its properties before and after the county had "bid in" the property and could redeem *224 it at any time before the subsequent sheriff's sale was completed. Before the deed is delivered to the purchaser, the sale must be confirmed by the court. Kan. Gen. Stat. Ann., sections 79-2301 et seq., 79-2401a, 79-2801 et seq., (1949). As we interpret these statutes, the title to real estate, which is subjected to a tax sale, continues to remain in the owner. If the owner purchases at the sale then the title to the property remains unchanged even though the owner may receive a sheriff's deed. This is true because the tax lien is merged into the owner's title. Assuming that petitioner did in fact have title to the properties, we conclude that it was obligated to pay the taxes on them and that the amounts paid at tax sales constituted the payment of taxes, deductible as such under section 164(a). Cf. John Randolph Hopkins, 15 T.C. 160 (1950), acq. 1951-C.B. 2, wherein it was held that the taxpayer's payment in redemption of his real property acquired by the town at a tax sale was a proper reduction for taxes paid. * The final issue relates to the alleged involuntary conversions during the years in issue and whether petitioner is entitled to postpone gains on such *225 conversions as provided by section 112(f)(3) of the 1939 Code for the year 1953 and section 1033(a)(3) of the 1954 Code for the remaining years. Although respondent determined in his statutory notice of deficiency that all of the gains on such conversions should have been reported as ordinary income in the years the properties were sold, he now concedes on brief "that petitioner is entitled to postpone the recognition of gain on adjustments in the statutory notice entitled 'Gain from condemnation awards' to the extent that these amounts were reinvested within the statutory period." Respondent apparently agrees that the alleged condemnations were in fact condemnations. And inasmuch as both parties have included all subsequent purchases of unimproved properties in their proposed schedules, they must agree that such purchases were reinvestments in similar properties, and we have so found. Therefore, the only question remaining is the extent of the reinvestments within the statutory period under sections 1033(a)(3)(A)(i)(ii) and 1033(a)(3)(B)(i). [5]
*226 Since we have found that the amounts paid by petitioner at sheriff's sales on its own properties resulted in the payments of taxes rather than repurchases of properties, these amounts cannot be included as reinvestments. In the computation of reinvestments, supra, we have included for 1953 one purchase in the amount of $302.10 that occurred one month before the receipt of proceeds from sales to railroads and the amount of $423.30 for 1955, representing purchases in 1955 prior to receipt of proceeds from the sale to the Kansas Turnpike Authority. Section 1033(a)(3)(A)(i) allows advance reinvestments if the purchased property is still held by the taxpayer at the date of disposition of the converted property. We conclude that petitioner, anticipating sales to these authorities possessing the power of condemnation, should be allowed to include these purchases as reinvestments. Accordingly, we hold that petitioner is entitled to postpone gains on involuntary conversions to the extent reinvestments were made within the statutory period as set forth in the Findings of Fact. Having determined *227 that petitioner held unimproved properties for sale to customers in the ordinary course of its business, the gains on the sales proceeds not reinvested are includable as ordinary income. Decision will be entered under Rule 50. Footnotes
*. By official order of the Tax Court, dated June 24, 1963 and signed by Judge Dawson, the stipulation of fact number 2, incorporated herein by reference, was set aside and replaced by the following: 2. Petitioner keeps its books and files its income tax returns on the cash method of accounting on a calendar year basis.↩
*. By official order of the Tax Court, dated June 24, 1963 and signed by Judge Dawson↩, the word "accrual" was deleted and the word "cash" substituted in lieu thereof.
1. Excludes partial lots and tracts. ↩
2. Includes dividend income.↩
1. SEC. 1221. CAPITAL ASSET DEFINED. For purposes of this subtitle, the term "capital asset" means property held by the taxpayer (whether or not connected with his trade or business), but does not include - (1) * * * property held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business; * * *. ↩
2. The equivalent statute for the year 1953 is sec. 117(a)(1)(A) of the 1939 Code.↩
3. SEC. 164. TAXES. (a) General Rule. - Except as otherwise provided in this section, there shall be allowed as a deduction taxes paid or accrued within the taxable year. ↩
4. The equivalent statute for the year 1953 is sec. 23(c)(1) of the 1939 Code.↩
5. SEC. 1033. INVOLUNTARY CONVERSIONS. (i) no property or stock acquired before the disposition of the converted property shall be considered to have been acquired for the purpose of replacing such converted property unless held by the taxpayer on the date of such disposition; and (ii) the taxpayer shall be considered to have purchased property or stock only if, but for the provisions of subsection (c) of this section, the unadjusted basis of such property or stock would be its cost within the meaning of section 1012. (B) Period Within Which Property Must Be Replaced. - The period referred to in subparagraph (A) shall be the period beginning with the date of the disposition of the converted property, or the earliest date of the threat or imminence of requisition or condemnation of the converted property, whichever is the earlier, and ending - (i) one year after the close of the first taxable year in which any part of the gain upon the conversion is realized, * * *. a1 By official order of the Tax Court, dated June 24, 1963 and signed by Judge Dawson↩, the court's opinion was amended by deleting the paragraph preceding paragraph which begins with an asterisk.