WILLIAM WALLER AND MILBREY W. WALLER, PETITIONERS, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

WILLIAM WALLER, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket Nos. 66319, 90677. Filed January 16, 1963.

666

*William Waller, Esq.,* and *Lawrence Dortch, Esq.,* for the petitioners.

*Robert B. Milsten, Esq.,* for the respondent.

ATKINS, *Judge:* The respondent determined deficiencies in income tax of petitioners William and Milbrey W. Waller, for the calendar years 1954 and 1955, in the respective amounts of $6,125.59 and $16,256.52, and in income tax of petitioner William Waller for the calendar year 1958 in the amount of $1,942.28.

A number of concessions have been made by the parties. The remaining issues raised by the pleadings are whether the petitioners are entitled to deductions, under section 170(a) of the Internal Revenue Code of 1954, on account of property contributed by them in 1954, 1955, and 1958 to the M. & W. Waller Fund; whether the tax upon amounts received by the petitioner William Waller in 1954 and 1955 as his share of legal fees earned by a partnership should be computed in the manner provided in section 107 of the 1939 Code and section 1301 of the 1954 Code; and whether the amount of $200 received by petitioner William Waller in 1958 under an annuity policy is taxable to the extent of $140.82 under section 72 of the 1954 Code or is nontaxable as a return of capital.

### FINDINGS OF FACT.

Some of the facts have been stipulated and are incorporated herein by this reference.

The petitioners William Waller and Milbrey W. Waller are husband and wife residing in Nashville, Tenn. They filed their joint income tax returns for the calendar years 1954 and 1955, and William Waller (sometimes hereinafter referred to as the petitioner) filed his separate return for the calendar year 1958, with the district director of internal revenue at Nashville.

On October 4, 1954, the petitioners executed a declaration of trust

creating the M. & W. Waller Fund, hereinafter referred to as the Fund, transferring to it at that time certain shares of stock. They named themselves as the trustees to take, hold, manage, invest, and reinvest the trust property, to collect any income therefrom, and to accumulate and distribute the net principal and net income as provided in the trust instrument.

Such declaration of trust provided, under the heading "Trust Purposes" in part as follows:

2.1 The purpose of the settlors in executing this instrument is to create and establish a trust fund or foundation to be operated exclusively for religious, charitable, scientific, literary and educational purposes, including, but not limited to the collection and/or preservation of property and documents relating to Middle Tennessee history, encouragement for the study and writing of such history, the promotion of public parks, and the encouragement of nature study, which purposes are hereinafter sometimes referred to collectively as "charitable purposes." The Trust Fund shall be invested, administered, increased and distributed by the Trustees solely for one or more of such charitable purposes, including financial assistance by way of scholarships or otherwise, to students in schools and colleges.

2.2 The Trustees are authorized and directed, in their uncontrolled discretion, to make such distributions from time to time from the Trust Fund as may be appropriate to accomplish any of the aforesaid objects and purposes, including but not limited to making contributions to any corporation, trust, community chest, fund, or foundation, organized and operated exclusively for one or more charitable purposes, no part of the net earnings of which inures to the benefit of any private shareholder or individual, and no part of the activities of which is carrying on propaganda, or otherwise attempting, to influence legislation.

2.3 The Trustees are further authorized, in their uncontrolled discretion, to make distributions from time to time from the Trust Fund to any individual who, because of age or mental or physical condition, is, in the judgment of the Trustees in need of financial aid, and to or for the benefit of any young person who needs financial aid to attend a school or college; provided, however, that in no event shall any distribution be made to or for the benefit of any donor to the Trust Fund, any Trustee of the Trust Fund, or any child of any such donor or Trustee, but relatives, former employees and children of employees of donors shall be given preference.

The declaration provided, under the heading "Powers, etc. of the Trustees," in part as follows:

3.1 The Trustees shall have the following powers, rights and authority exercisable in each case in their uncontrolled discretion and without applying to any court for its approval:

* * * * * * *

(b) *Investments*—To invest and reinvest in any property, real or personal, of any kind or nature, including, without limitation, domestic and foreign stocks (whether common, preferred or other), bonds, secured or unsecured, common trust funds, obligations, mortgages, other securities, and interests in any of the foregoing, whether or not authorized by law for the investment of trust funds, and whether or not income-producing, of a wasting nature or in default, and without regard to the amount invested in any one investment or any one class or type of investment; and to hold moneys uninvested.

* * * * * * *

(f) *Loans*—To make any loans, either secured or unsecured, in such amounts, upon such terms, at such rates of interests, and to such persons (not including any Trustee or any child of a Trustee), firms or corporations, as they may determine.

\*    \*    \*    \*    \*    \*    \*

(h) *Nominees, etc.*—To cause any securities or other property at any time held by them to be registered in their names or in the name of a nominee or nominees, with or without indicating their trust character, or to hold the same unregistered or in such form as will pass by delivery.

The trustees were authorized to appoint an additional trustee or trustees to act with them and could resign at any time by written notice to the other trustee or trustees. The trust was irrevocable and was to remain in effect until the entire trust fund was distributed for the purposes stated. It was further provided that no amendment should be effective except as to additions to the fund made after the date of amendment. It was also provided that upon the termination of the trust for any reason, the entire fund not theretofore distributed should be distributed equally to a designated church, university, and school.

On November 1, 1955, the petitioner filed with the Internal Revenue Service an application for exemption of the Fund from income tax. Such application was acknowledged on November 3, 1955, but was never ruled upon by the Internal Revenue Service.

On May 10, 1957, the petitioners appointed the Nashville Bank & Trust Co. of Nashville, Tenn., as an additional trustee to handle the investments of the Fund. On May 31, 1957, the petitioners, as settlors and trustees, and the bank as additional trustee, executed an instrument amending section 3.1(h) of the above declaration of trust by eliminating therefrom the words "in their names or," and amending the proviso clause of section 2.3 to read as follows:

provided, however, that in no event shall any distribution be made to or for the benefit of any donor to the Trust Fund, any Trustee of the Trust Fund, or any child of any such donor or Trustee, or any person to whom any such donor or Trustees owes, directly or indirectly, any obligation of support.

The above amendments were stated to be applicable with respect to all present or future trust property.

On February 4, 1958, section 3.1(h) of the declaration of trust was further amended by changing the period at the end of such paragraph (h) to a semicolon and adding the following:

provided, however, that nothing herein shall be construed to permit the Trustees to register securities in their own names or in the name of any of them without disclosure of the fiduciary relationship, and provided further that the property of the Trust Fund shall at all times be maintained separately and dealt with by the Trustees on all occasions as property of such Trust Fund.

It was provided that this amendment, also, was applicable with respect to all present and future trust property. All of the above

amendments were made as a result of criticism by representatives of the Internal Revenue Service of the existing provisions.

During 1954 and 1955 the petitioners made 17 gifts, including the initial gift, to the Fund totaling $4,767.90 and $15,286.14, respectively. In 1955, the petitioner William Waller made an outright donation to the Fund of securities which had appreciated in value while held by him, and treated the fair market value of the securities as the amount of the gift. Each of the petitioners in those years made several sales to the Fund of securities which had appreciated in value while in their hands, the selling price to the Fund being the cost basis in the hands of the petitioners, and in each of these instances the difference between basis and fair market value of the securities was treated by them as the amount of the gift. In 1955 the petitioner William Waller also made two transfers to the Fund of securities from his personal margin account, subject to an amount of his personal indebtedness on his margin account equal to the cost of the securities to him. The petitioner accomplished these transfers from his margin account by instructing the broker to take the securities out of his margin account and place them in an account in the name of the Fund, subject to an indebtedness to the broker in an amount equal to the petitioner's cost of such securities. In each of such instances the difference between the indebtedness (equal to petitioner's cost) and the fair market value of the securities was treated by the petitioner as the amount of the gift. In 1958 the petitioner made one outright donation to the Fund, consisting of appreciated stock with a fair market value of $2,987.50. The securities donated outright to the Fund in the years 1954, 1955, and 1958 were sold by the Fund within 2 to 8 days after receipt of the donations. The securities sold by the petitioners to the Fund in 1954 and 1955 at the petitioners' cost were in each instance sold by the Fund before making payment to the petitioners. Such sales by the Fund were generally made either on the same day or within 4 days after receipt of the stock from the petitioners, but in two instances the sales were 9 days and 21 days afterwards. The securities which the Fund received in 1955 from the petitioner's margin account were sold, in one instance on the day of receipt, and in the other 28 days later.

During 1956 and 1957 the petitioner William Waller made three outright donations to the Fund of securities which had appreciated in value in his hands and made one sale to the Fund of appreciated securities at his cost. The Fund sold the above securities generally either on the day of receipt or within 7 days of such receipt. The petitioners have not made any donations to the Fund since 1958.

At no time did the petitioners transfer to the Fund any securities which had a fair market value less than the cost basis of such securities in their hands.

No donations have ever been made to the Fund by persons other than the petitioners.

On several occasions during the years from 1954 through 1958 the Fund purchased securities on its own account from others than the petitioners, and on occasions sold such securities. On two occasions stock was purchased and held in the names of nominees, but neither these stocks nor any property of the Fund were ever commingled with property not belonging to the Fund.

During the years 1952 through 1958 the petitioner had gains and losses from sales or exchanges of capital assets as follows:

| Year: | Gains | Losses |
| --- | --- | --- |
| 1952 | $1,971.75 | $3,261.85 |
| 1953 | 12,688.86 | 1,006.26 |
| 1954 | 28,515.19 | 384.05 |
| 1955 | 774.93 | 6,779.47 |
| 1956 | 8,696.74 | 8,758.76 |
| 1957 | 2,949.76 | 5,402.33 |
| 1958 | 10,160.79 | 3,924.14 |

During those years the petitioner made deductible charitable contributions to donees other than the Fund as follows:

| Year: | Amount |
| --- | --- |
| 1952 | $6,075.00 |
| 1953 | 8,768.25 |
| 1954 | 4,656.75 |
| 1955 | 35.00 |
| 1956 | 4,125.00 |
| 1957 | 2,062.50 |
| 1958 | 4,305.00 |

From its creation in 1954 to June 1, 1961, the Fund made distributions totaling $20,050.64 to various organizations, including churches, schools, the United Givers Fund of Nashville, the American Cancer Society, the Red Cross, and others. No amounts have ever been distributed by the Fund to individuals, and no loans have ever been made by it.

During its years of existence, the Fund's investments have always consisted of corporate securities and units in a common trust fund of the Nashville Bank & Trust Co. Since November 4, 1958, all of its investments have been in such trust fund. The net assets of the Fund from its creation to November 1, 1959, were as follows:

| Date: | Net assets |
| --- | --- |
| Nov. 1, 1954 | $4,248.59 |
| Jan. 1, 1955 | 3,966.59 |
| Jan. 1, 1956 | 11,996.04 |
| Jan. 1, 1957 | 14,818.25 |
| Jan. 1, 1958 | 14,195.22 |
| Jan. 1, 1959 | 14,038.15 |
| Nov. 1, 1959 | 11,698.30 |

The record does not disclose details as to receipts and disbursements of the Fund except for the calendar year 1958. During 1958 the Fund received $7,419.40 representing proceeds from sales of corporate securities and $392.32 representing dividends on investments, or a total of $7,811.72. During that year it reinvested $3,473.17 in the above common trust fund, expended $29.65 in administrative fees, and made contributions in the amount of $3,519.14 to organizations of the type described above, thus making total disbursements of $7,021.96.

In their joint income tax returns for the calendar years 1954 and 1955, the petitioners deducted as charitable contributions the respective amounts of $18,581.65 and $15,366.64, of which $4,767.90 and $15,286.14, respectively, were contributions by them to the Fund which were disallowed as deductions by the respondent in the deficiency notice. In his income tax return for the calendar year 1958 the petitioner William Waller deducted as charitable contributions the amount of $7,292.50, of which $2,987.50 was a contribution to the Fund which was disallowed as a deduction by the respondent in the deficiency notice. In the notices of deficiency the respondent took the position that it had not been established or determined that contributions to the Fund were deductible under section 170 of the Internal Revenue Code of 1954, stating that it had not been established or determined that the Fund was exempt from taxation under the provisions of section 501(c)(3) of the Code.

The Fund, during the taxable years 1954, 1955, and 1958 was organized and operated exclusively for religious, charitable, scientific, literary, and educational purposes.

By an annuity policy dated September 15, 1933, the Sun Life Assurance Co. of Canada agreed to pay $50 to petitioner on September 2, 1958, and a like amount monthly thereafter on the second day of each succeeding month during the subsequent lifetime of the petitioner, in consideration of the payment by the petitioner to the company of $129.25 on September 2, 1933, and the payment of a like amount yearly thereafter on September 2 in every year until 25 full years' premiums should have been paid. The policy stated in part as follows:

Payment of Annuity. The person or persons entitled to any payment under this policy shall be bound to produce proof, in writing, satisfactory to the Company, that the annuitant was alive on the day on which the said payment became due, and the Company will not be liable for any annuity payment under this policy, except on the production of such proof. No part of the purchase price shall be returnable by the Company at the death of the annuitant and no portion of the annuity shall be payable for any fractional period between the date on which the last payment becomes due and the date of death.

The petitioner received a total of $200 from the company pursuant to this policy in 1958. He did not report any of this amount as income in his income tax return for the calendar year 1958. In the notice of deficiency the respondent determined that $59.18 of the $200 was

excludable from the petitioner's income under section 72 of the 1954 Code and that the balance of $140.82 constituted taxable income to him.

OPINION.

During the taxable years 1954, 1955, and 1958 the petitioners transferred outright to the Fund securities which had enhanced in value in their hands over the cost basis thereof and also sold to the Fund at their cost basis other securities which had enhanced in value over basis. Also, the petitioner William Waller transferred securities to the Fund subject to his indebtedness under a margin brokerage account in the amount of his cost basis of the securities. In the case of the outright gifts, the petitioners claimed the full fair market value of the securities as charitable contributions; in the case of the sales at cost basis and transfers subject to indebtedness equal to cost basis, the petitioners claimed as charitable contributions the excess of the fair market value of the securities over the amount paid and indebtedness assumed by the Fund. The respondent disallowed all such contributions claimed as deductions under section 170 of the Internal Revenue Code of 1954,[1] on the ground that the Fund was not organized and operated exclusively for religious, charitable, scientific, literary, or educational purposes as required by that section and by section 501 of the Code.[2] He does not question that contributions were made in the amounts claimed.

[1] Section 170 provides, in part, as follows:

(a) ALLOWANCE OF DEDUCTION.—

(1) GENERAL RULE.—There shall be allowed as a deduction any charitable contribution (as defined in subsection (c)) payment of which is made within the taxable year. * * *

\* \* \* \* \* \* \*

(c) CHARITABLE CONTRIBUTION DEFINED.—For purposes of this section, the term "charitable contribution" means a contribution or gift to or for the use of—

\* \* \* \* \* \* \*

(2) A corporation, trust, or community chest, fund, or foundation—

(A) created or organized in the United States, or in any possession thereof, or under the law of the United States, any State or Territory, the District of Columbia, or any possession of the United States;

(B) organized and operated exclusively for religious, charitable, scientific, literary, or educational purposes or for the prevention of cruelty to children or animals;

(C) no part of the net earnings of which inures to the benefit of any private shareholder or individual; and

(D) no substantial part of the activities of which is carrying on propaganda, or otherwise attempting, to influence legislation. * * *

[2] Section 501 provides, in pertinent part, as follows:

(a) EXEMPTION FROM TAXATION.—An organization described in subsection (c) or (d) or section 401(a) shall be exempt from taxation under this subtitle unless such exemption is denied under section 502, 503, or 504.

\* \* \* \* \* \* \*

(c) LIST OF EXEMPT ORGANIZATIONS.—The following organizations are referred to in subsection (a):

\* \* \* \* \* \* \*

(3) Corporations, and any community chest, fund, or foundation, organized and operated exclusively for religious, charitable, scientific, testing for public safety, literary, or educational purposes, or for the prevention of cruelty to children or animals, no part of the net earnings of which inures to the benefit of any private shareholder or individual, no substantial part of the activities of which is carrying on propaganda, or otherwise attempting, to influence legislation, and which does not participate in, or intervene in (including the publishing or distributing of statements), any political campaign on behalf of any candidate for public office.

The respondent first contends that the Fund does not meet the test of "organized" exclusively for the purposes stated in the statute. He points to the fact that under the trust instrument the trustees were authorized in their uncontrolled discretion to make distributions to any individual (other than any donor or trustee or child of a donor or trustee) who because of age or mental or physical condition was in need of financial aid, and to make distributions to any young person who needed financial aid, to attend a school or college, and that prior to the amendment of the instrument in 1957, the trustees were directed to give preference to relatives, former employees, and children of employees of donors. He also refers to the provision of the trust instrument giving the trustees the right to make loans either secured or unsecured at such rates of interest and to such persons, not including any trustee or child of a trustee, as they might determine. It is respondent's contention that since the petitioners were trustees and the only donors and since they were in control of the Fund, these provisions are not consistent with an exclusively charitable or other exempt purpose.

The trust instrument specifically provides that the purpose was to establish a fund or foundation to be operated exclusively for religious, charitable, scientific, literary, and educational purposes, and that the trust should be administered solely for one or more of such purposes. Accordingly, we think that the provisions to which the respondent refers must be read in the light of the overall purposes of the Fund, and that it should not be assumed that the trustees would make distributions or loans in contravention of the overall purposes.

We have carefully considered the effect of the provision with respect to the preference to be given to relatives of the donors if distributions should be made to individuals in financial need and to young persons in need of financial aid to attend a school or college, in view of the provisions of section 503 of the Code.[3] But for that

---

[3] SEC 503. REQUIREMENTS FOR EXEMPTION.

  (a) DENIAL OF EXEMPTION TO ORGANIZATIONS ENGAGED IN PROHIBITED TRANSACTIONS.—

   (1) GENERAL RULE.—An organization described in section 501(c)(3) which is subject to the provisions of this section shall not be exempt from taxation under section 501(a) if it has engaged in a prohibited transaction after July 1, 1950 * * *

   (2) TAXABLE YEARS AFFECTED.—An organization described in section 501(c)(3) * * * shall be denied exemption from taxation under section 501(a) by reason of paragraph (1) only for taxable years after the taxable year during which it is notified by the Secretary or his delegate that it has engaged in a prohibited transaction * * * and such transaction involved a substantial part of the corpus or income of such organization.

    *       *       *       *       *       *       *

  (c) PROHIBITED TRANSACTIONS.—For purposes of this section, the term "prohibited transaction" means any transaction in which an organization subject to the provisions of this section—

   (1) lends any part of its income or corpus, without the receipt of adequate security and a reasonable rate of interest, to;

    *       *       *       *       *       *       *

   (3) makes any part of its services available on a preferential basis to;

section we think there would be little or no question that the purposes of the Fund were of a public charitable character, inasmuch as it has been held that there may be a public charity even where the creator has given a preference to relatives, if the beneficiaries are not limited to relatives. See *Estate of Agnes C. Robinson*, 1 T.C. 19, and *Estate of Annie Sells*, 10 T.C. 692, and authorities cited therein.[4] Section 503 is the successor to section 3813 of the Internal Revenue Code of 1939 which was enacted by the Revenue Act of 1950, subsequent to the decisions above referred to. It sets forth certain prohibited transactions which would cause an organization, otherwise exempt, to lose its exemption, and render contributions to it nondeductible. These prohibited transactions include the making of any part of the organization's services available on a preferential basis to its creator or a substantial donor, or a member of his family, and engaging in any other transaction which would result in a substantial diversion of its income or corpus to any such persons. However, it is to be noted that section 503 operates to deny exemption only if the organization in its operation actually engages in a prohibited transaction, and disallows deductions of contributions to it only if, in the year the contribution is made, the organization has been rendered nonexempt by reason of having actually engaged in a prohibited transaction. Here the Fund has never made a distribution to the petitioners or to any members of their families; nor has it ever loaned any part of its income or corpus to the petitioners or to any members of their families.

As pointed out hereinabove, the overall purposes stated in the declaration of trust are exclusively religious, charitable, scientific, literary, and educational. It appears from such declaration that the principal purpose of the Fund was to make contributions or distributions to other organizations of an exempt character, and in practice this was all that the Fund did. While the trustees were *authorized* to

---

(4) makes any substantial purchase of securities or any other property, for more than adequate consideration in money or money's worth, from ;

\*        \*        \*        \*        \*        \*        \*

(6) engages in any other transaction which results in a substantial diversion of its income or corpus to ;

the creator of such organization (if a trust) ; a person who has made a substantial contribution to such organization ; a member of the family (as defined in section 267(c)(4) [brothers, spouse, ancestors, and lineal descendants] of an individual who is the creator of such trust or who has made a substantial contribution to such organization \* \* \*.

\*        \*        \*        \*        \*        \*        \*

(e) DISALLOWANCE OF CERTAIN CHARITABLE, ETC., DEDUCTIONS.—No gift or bequest for religious, charitable, scientific, literary, or educational purposes \* \* \* otherwise allowable as a deduction under section 170 \* \* \* shall be allowed as a deduction if made to an organization described in section 501(c)(3) which, in the taxable year of the organization in which the gift or bequest is made, is not exempt under section 501(a) by reason of this section. \* \* \*

[4] And the fact that employees of the creator and donor are preferred beneficiaries does not detract from the exclusively charitable nature of an organization. See *T. J. Moss Tie Co.*, 18 T.C. 188, petition to review dismissed (C.A. 8) 201 F. 2d 512.

make distributions to individuals for charitable or educational purposes, in which case they were to give preference to relatives of the donors, we think it reasonable to conclude that such authorization, since not exercised,[5] does not indicate a purpose at variance with the basic purposes of the organization which were of an exclusively exempt character within the contemplation of the statute, or at least does not indicate a substantial nonexempt purpose. Cf. *Better Business Bureau of Washington, D.C., Inc.,* v. *United States,* 326 U.S. 279. It should be added that prior to the taxable year 1958 the provision of the trust instrument with respect to preference of relatives had been eliminated.

The respondent has also questioned provisions of the declaration of trust permitting the trustees to invest in property whether or not income-producing and whether or not of a wasting nature, and permitting them to hold securities or other property in their names or in the names of nominees with or without indicating their trust character. However, these provisions certainly do not indicate that the Fund was not organized exclusively for an exempt purpose. Here again it should not be assumed that the trustees would act in violation of their fiduciary obligations. It may be pointed out that in fact they as trustees did not invest in speculative properties and did not commingle property of the Fund with any property not belonging to the Fund.

It is our conclusion that the Fund was organized exclusively for one or more of the exempt purposes set forth in sections 170 and 501 of the Code.

The respondent also contends that the Fund was not *operated* exclusively for exempt purposes because it was the practice of the petitioners to contribute to the Fund the unrealized appreciation in value of securities and thereby avoid the payment of capital gains tax on such appreciation, while at the same time claiming a charitable deduction for such appreciation. He states on brief that while such a practice would not be objectionable in the case of contributions to exempt organizations which are completely independent of the donors, it is objectionable here since, he contends, the dominant purpose behind the organization and operation of the Fund was that of a personal

---

[5] In the past it has been held that powers of trustees are not necessarily equated with purposes of the trust; that the existence of broad powers in the trustees to administer the trust does not compel a finding or holding that the trust was not organized exclusively for charitable purposes; that it is sometimes necessary to look to operations as an aid in determining the actual purposes for which an organization was organized. See *Commissioner* v. *John Danz Charitable Trust* (C.A. 9) 284 F. 2d 726, affirming 32 T.C. 469. We are not here concerned with section 1.501(c)(3)–1 of the Income Tax Regulations which provides, among other things, that the fact that the actual operations of an organization have been exclusively in furtherance of one or more exempt purposes shall not be sufficient to permit the organization to meet the organizational test. Such section is, by its terms, applicable only with respect to taxable years beginning after July 26, 1959. Prior regulations do not contain similar provisions.

taxsaving desire of the petitioners,[6] rather than the public charitable purpose contemplated by the statute. He states that the petitioners' personal purposes may not be divorced from those of the Fund itself, and that because of these purposes and the mode of operation of the Fund, the Fund was a "conduit" for promoting the private tax advantages of the petitioners and therefore was not operated *exclusively* for exempt purposes.

We cannot accept the respondent's view in this respect. Whether it was operated exclusively for an exempt purpose must, we think, be judged by its activities. The evidence shows that it used its funds for investment and for making contributions to organizations which appear to be of the character which are exempt from tax under the statute. The respondent does not contend that such organizations were not tax exempt. It clearly appears that none of the operations of the Fund, including the purchase of securities from the petitioner at the petitioners' cost bases, were in any way inconsistent with a charitable or other exempt purpose. In each instance the transaction was a profitable one to the Fund, thereby making available funds for such exempt purposes. In no instance was the transaction merely an accommodation to the donors at the risk of the loss of funds dedicated to a charitable purpose as was true in *Leon A. Beeghly Fund*, 35 T.C. 490, affirmed on another issue (C.A. 6) 310 F. 2d 756, cited by the respondent. It is true that the Fund always sold the securities transferred to it by the petitioners prior to making payment to the petitioners of the purchase price. However, there is no evidence whatsoever, and we do not understand that the respondent contends, that the Fund was merely acting as the agent of the petitioner in selling such securities or in consummating sales of securities which had been initiated by the petitioners.

The fact that the petitioners chose to sell their securities to the Fund at their cost and thereby avoid the payment of a tax upon the appreciation in value of such securities which would have resulted had they sold such securities to third parties, does not, in our opinion, militate against the tax-exempt status of the Fund or against the deductibility of the contributions made. As stated in *Gregory* v. *Helvering*, 293 U.S. 465, the legal right of a taxpayer to decrease the amount of what otherwise would be his taxes, or altogether avoid them, by means which

---

[6] The petitioner testified in part as follows:

"My personal purposes in setting it up, well, I am getting along in years and have had a fairly good income from law practice and my wife and I are called on to make a great many donations and we thought that during my fat years it was a pretty good idea to build up a fund that could be used later for making these donations. Also I obviously had in mind that when you make reasonably small donations to a lot of charitable organizations it is rather difficult to do it with appreciated securities, as I do with larger donations and by having a fund one could transfer appreciated securities or sell those appreciated securities at the donor's cost and obtain a tax deduction. So I am sure you are asking me whether I had a tax motive, that is the purpose of your inquiry and I obviously did but the fund itself has no tax motive * * *."

the law permits, cannot be doubted. The income tax regulations have long provided that if a charitable contribution is made in property the amount of the deduction is determined by the fair market value of the property at the time of the contribution. Sec. 1.170–1(c)(1), Income Tax Regs. Thus, the fact that the enhancement in value of the petitioners' securities over and above their bases had not been realized for tax purposes would not affect the deductibility of the gift. This principle has long been recognized by the respondent. See L.O. 1118, II–2 C.B. 148 (1923). Nor is the deductibility of the amount of the gift affected by the fact that in some instances the Fund paid to the petitioners a purchase price equal to the bases of the securities in the hands of the petitioners or assumed indebtedness equal to such bases. The amount of the gift is the difference between the fair market value of the property and the amount which the Fund paid therefor or the amount of indebtedness which it assumed. See *Maysteel Products, Inc.*, 33 T.C. 1021, reversed on other issues (C.A. 7) 287 F. 2d 429, and example (3), sec. 1.1001–1(e), Income Tax Regs.

The fact that the Fund purchased securities from the petitioners, does not, under present circumstances, render section 503 operative to defeat its exemption or the deductibility of contributions to it. That section prohibits the making of any substantial purchase of securities or other property from the creator of the organization, or a person who has made a substantial contribution to such organization, for more than adequate consideration in money or money's worth. There is no prohibition against making purchases of securities or other property for less than adequate consideration. In connection with the enactment, by section 331 of the Revenue Act of 1950, of section 3813 of the Internal Revenue Code of 1939 (predecessor of section 503 of the 1954 Code) it had been proposed to deny deductions to donors if any substantial part of the assets of the recipient organization were used to purchase securities or other property from any substantial donors of the organization or any of its officers or trustees. However, the congressional committee reports state that it was believed that the proposed provisions would be unduly harsh, and that no objection was seen to engaging in transactions with donors if the transactions were carried out at arm's length. See S. Rept. No. 2375, 81st Cong., 2d sess., pp. 36, 37, and 123, 1950–2 C.B. 510, 511, and 571, and Conf. Rept. No. 3124, 81st Cong., 2d sess., pp. 36 and 37, 1950–2 C.B. 591.

In view of the foregoing it is our conclusion that during the taxable years in question the Fund was organized and operated exclusively for one or more of the purposes set forth in sections 170(c)(2) and 501(c)(3) of the Code and that the contributions made to it by the petitioners are deductible as provided in section 170 of the Code.

The petitioner contends that the respondent erred in taxing to him in the taxable year 1958 any portion of the $200 received by him in

that year under the annuity policy described in the Findings of Fact. He concedes that the respondent's computation under section 72 of the Internal Revenue Code of 1954 [7] is correct, but points out that if a taxpayer reports annuity payments under section 72 but dies before recouping his investment, he is not entitled to a deductible loss or other adjustment for tax purposes in the year of his death, and that an individual taxpayer may die long before recouping his investment after having paid income taxes on payments which constituted return of capital. It is his position that if section 72 be interpreted as requiring any part of the annuity payments to be included in his taxable income for 1958 and subsequent years, prior to the return in full to him of his investment, then the tax imposed is not upon income and is, to that extent, unconstitutional and void and is not authorized by the 16th amendment to the Constitution. He therefore contends that, to conform to constitutional requirements, section 72 must be construed as providing an election rather than as being mandatory.

At the outset it may be stated that we think there can be no question that section 72, by its terms, is mandatory, and does not provide annuitants with an election as to how they shall report annuity payments for income tax purposes.

An act of Congress is not lightly to be set aside; doubts must be resolved in its favor; and the presumption of validity is particularly strong in the case of a revenue measure. *Nicol* v. *Ames*, 173 U.S. 509; *Penn Mutual Indemnity Co.*, 32 T.C. 653, affd. (C.A. 3) 277 F. 2d 16;

---

[7] Section 72 provides in part as follows:

(a) GENERAL RULE FOR ANNUITIES.—Except as otherwise provided in this chapter, gross income includes any amount received as an annuity (whether for a period certain or during one or more lives) under an annuity, endowment, or life insurance contract.

(b) EXCLUSION RATIO.—Gross income does not include that part of any amount received as an annuity under an annuity, endowment, or life insurance contract which bears the same ratio to such amount as the investment in the contract (as of the annuity starting date) bears to the expected return under the contract (as of such date). This subsection shall not apply to any amount to which subsection (d)(1) (relating to certain employee annuities) applies.

(c) DEFINITIONS.—

(1) INVESTMENT IN THE CONTRACT.—For purposes of subsection (b), the investment in the contract as of the annuity starting date is—

(A) the aggregate amount of premiums or other consideration paid for the contract, minus

(B) the aggregate amount received under the contract before such date, to the extent that such amount was excludable from gross income under this subtitle or prior income tax laws.

*       *       *       *       *       *       *

(3) EXPECTED RETURN.—For purposes of subsection (b), the expected return under the contract shall be determined as follows:

(A) LIFE EXPECTANCY.—If the expected return under the contract, for the period on and after the annuity starting date, depends in whole or in part on the life expectancy of one or more individuals, the expected return shall be computed with reference to actuarial tables prescribed by the Secretary or his delegate.

(B) INSTALLMENT PAYMENTS.—If subparagraph (A) does not apply, the expected return is the aggregate of the amounts receivable under the contract as an annuity.

(4) ANNUITY STARTING DATE.—For purposes of this section, the annuity starting date in the case of any contract is the first day of the first period for which an amount is received as an annuity under the contract; except that if such date was before Jan. 1, 1954, then the annuity starting date is Jan. 1, 1954.

and *Eleanor C. Shomaker*, 38 T.C. 192, petition for review dismissed (C.A. 8) December 13, 1962. The taxing power of Congress was granted by article I of the Constitution and such power is exhaustive and embraces every conceivable power of taxation, subject only to certain constitutional restrictions, one of which is that direct taxes shall be apportioned among the States according to population. As pointed out in *Penn Mutual Indemnity Co. v. Commissioner*, *supra*, the requirement of apportionment is strictly limited to taxes on real and personal property and capitation taxes. The 16th amendment to the Constitution provides that income from any source may be taxed without apportionment. And as we pointed out in the *Penn Mutual Indemnity Co.* case, a tax upon gross receipts is not unconstitutional.

Clearly the tax imposed by section 72 is not a direct tax upon any property owned by taxpayers. Rather, it is a tax upon payments which taxpayers receive pursuant to annuity contracts. We think it clear that the taxation of such receipts is within the all-inclusive taxing power of Congress.

It may be added that in any event we think Congress has precluded any possible constitutional objections by providing that there shall be excluded from income that part of any annuity payment which bears the same ratio to the amount of the payment as the investment in the contract bears to the expected return under the contract. The expected return is computed, in the case of an annuity of the type here involved, upon the basis of the life expectancy of the annuitant ascertained by reference to actuarial tables. We see nothing unreasonable or capricious in this manner of computing the part of each payment which constitutes a return of the annuitant's cost and the part which constitutes gain. While in the case of the type of annuity here involved the annuitant might never recover his cost tax free, he might, on the other hand, under the statutory provision, receive a great deal more than his cost tax free, depending upon the actual length of his life.

It may be further pointed out that the constitutionality of section 22(b)(2) of the 1939 Code, predecessor of section 72 of the 1954 Code, has been upheld on numerous occasions. See *Manne v. Commissioner*, (C.A. 8) 155 F. 2d 304, affirming a Memorandum Opinion of this Court; *Florence M. Shelley*, 10 T.C. 44; *Title Guarantee & Trust Co., Executor*, 40 B.T.A. 475; *F. A. Gillespie*, 38 B.T.A. 673; and *Egtvedt v. United States*, 112 Ct. Cl. 80. While the provisions of section 72 of the 1954 Code and section 22(b)(2) of the 1939 Code are not the same, they are similar in that each provides for the taxation of portions of annuity payments prior to complete recovery of cost.

The petitioner relies principally upon *Burnet v. Logan*, 283 U.S. 404, in which the Supreme Court held that receipts from an inherited

contract did not constitute income until the amount at which the contract was valued for estate tax purposes had been recouped. However that case did not involve a constitutional question; it merely held that payments there involved did not constitute income within the intendment of the income tax statute which was in effect at that time. Here section 72 of the Code clearly provides that annuity payments shall be considered as income to the extent provided therein.

We hold that section 72 of the 1954 Code is not unconstitutional and that the respondent did not err in taxing the petitioner upon the annuity payments received by him in the taxable year 1958.

On brief the petitioners state that they waive the issue as to whether they may compute the taxes attributable to William Waller's share of legal fees received by his law partnership in 1954 and 1955 under section 107(a) of the 1939 Code and section 1301 of the 1954 Code, if the decisions are in their favor on the issues of the deduction of bond premium amortization and the deduction of charitable contributions. After submission of the briefs the respondent, in a supplemental stipulation of facts, conceded the issue relating to the deduction of bond premium amortization, and our decision is for the petitioners on the charitable deduction issue. Accordingly, we approve the respondent's determination with respect to the manner of taxing the legal fees, without expressing any opinion as to the correctness of such determination.

*Decisions will be entered under Rule 50.*