HERBERT O. ROBINSON and SUSAN C. ROBINSON, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent H. M. ARMANTROUT and BETTY L. ARMANTROUT, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Robinson v. Commissioner
Docket Nos. 7239-71, 7240-71.
United States Tax Court
T.C. Memo 1974-257; 1974 Tax Ct. Memo LEXIS 59; 33 T.C.M. (CCH) 1140; T.C.M. (RIA) 74257; September 24, 1974, Filed. Frederick W. Peirsol and James A. McNabb, Jr., for the petitioners. Donald W. Williamson, Jr., for the respondent. FORRESTER
MEMORANDUM FINDINGS OF FACT AND OPINION FORRESTER, Judge: In these consolidated cases, respondent has determined deficiencies in income tax for 1968 in the amounts of $11,526.59 in docket No. 7239-71, and $5,742.97 in docket No. 7240-71. The sole issue for our decision is the *60 value of certain real estate, in which Herbert O. Robinson and H. M. Armantrout each owned a one-third undivided interest and which Orange County, Florida, took by condemnation on December 19, 1968, the date on which a Florida court of competent jurisdiction ordered the taking. Respondent concedes that petitioners have made a charitable contribution within the meaning of section 170(c) (1) [1] to the extent the value of the property exceeded $45,035. FINDINGS OF FACT Some of the facts have been stipulated and are so found. Petitioners Herbert Robinson (Robinson) and Susan Robinson and petitioners H. M. Armantrout (Armantrout) and Betty Armantrout are respectively husband and wife, all of whom resided in Winter Park, Florida, at the time the petitions were filed. Each pair of petitioners filed a joint income tax return for 1968 with the district director of internal revenue, Jacksonville, Florida. In 1959 Robinson and Armantrout (taxpayers) each acquired for investment a one-third undivided interest in approximately 150 acres of real estate in Orange County, Florida (County), *61 that was zoned and used for agricultural purposes; the late Nelson Robinson owned the remaining one-third interest. In 1962 the taxpayers sought an exception to the zoning that would permit use of the 150 acres as a cemetery; the zoning exception was granted for all but approximately 10 acres which were to be a buffer zone between the cemetery and a residential neighborhood, but the exception was subject to the County engineer's approval of the water level and drainage of the land. Although the County engineer certified all of the land to be acceptable for cemetery use, his certification was based on the assumption that the County's Little Econlockhatchee River water control project (Econ project) would be completed before certain parts of the land would be utilized as a cemetery. In September 1962, the taxpayers applied to the state comptroller for a permit to form a cemetery corporation, and they received the permit in October 1963. On March 2, 1964, Chapel Hill, Inc. (Chapel Hill), a cemetery corporation operated for profit, was formed under the laws of Florida. Taxpayers and the late Nelson Robinson conveyed 94 of the 140 acres provisionally zoned for cemetery use to Chapel *62 Hill. Thereafter, through 1968, the stock ownership in Chapel Hill was as follows: No. Shares
% Ownership Robinson
9,500
23.75
Armantrout
9,500
23.75
Nelson Robinson
7,000
17.50
Others
14,000
35.00
Armantrout, whose primary occupation was investment in stocks and real estate, was elected president and general manager of Chapel Hill and was so employed through 1968. Robinson has never been active in the daily operation of the corporation though he held the honorary title of chairman of the board. Of the 150 acre tract, the 94 acres conveyed to Chapel Hill were the most conducive to cemetery development. This land was cleared, adequately drained pasture land suitable for roadways, gravesites and the improvements necessary to a cemetery's operation. In September 1964, Chapel Hill received a state license permitting the operation of a cemetery, and through 1968 Chapel Hill had improved 60 of its 94 acres for cemetery use. Over the life of Chapel Hill, its 94 acres would yield approximately 96,000 gravesites. Through 1968 approximately 1,500 gravesites had been sold. Taxpayers and Nelson Robinson retained ownership of the remaining 36 acres *63 that had been granted an exception from zoning for cemetery use. This acreage was part of a natural drainage basin through which a stream ran and which was subject to flooding. The Little Econlockhatchee River (Little Econ) also cut through this land. The soil consisted of muck and sand, and it was low, wet and marshy in some areas and high and dry in others. The land was covered with dense undergrowth and was heavily wooded with pine trees. As part of the Econ project, in 1968 the County began condemnation proceedings to take land that was subject to flooding or needed for improving the County's water control and drainage. Of the 36 acres provisionally zoned for cemetery use and retained by the taxpayers, 22.2 were included in the County's proposed taking. The County's proposal would have left taxpayers with approximately six acres on one side of the Little Econ, isolated and inaccessible from the Chapel Hill grounds and from the other acreage retained by the taxpayers and not taken by the County. Some of the land retained by the taxpayers and included in the proposed taking was used in Chapel Hill's operations as a tree nursery, for storage of vaults and equipment, and *64 for dumping of excess dirt from graves. At Armantrout's request, the County modified its proposed taking so that none of the land used in Chapel Hill's operations was taken and so that all of the isolated land on the one side of the Little Econ was taken. Thus, the County's final proposal was to take 25.39 acres of the 36 retained by the taxpayers. The County retained the services of two professional real estate appraisers, James J. Bettes (Bettes) and Alvin R. Schneider (Schneider) to appraise the land that the County proposed to take for the Econ project, including that owned by the taxpayers. Bettes and Schneider rendered an opinion as to the value of the approximately 22 acres of taxpayers' land initially proposed for condemnation. Bettes submitted his appraisal report on June 10, 1968, valuing the 22.2 acres at $27,875. Schneider's appraisal report, dated June 14, 1968, valued this land at $36,000. After the County modified its proposed taking, Schneider revised his opinion on October 7, 1968, and appraised the 25.39 acres of taxpayers' land proposed for taking at $41,850. At respondent's request, Bettes revised his appraisal on February 15, 1973, and valued the approximately *65 25 acres at $40,000. Neither Schneider nor Bettes had ever before appraised land to be used in cemetery operations; however, Schneider was familiar with articles on cemetery appraising. From personal inspections of the taxpayers' land which the County proposed to take, both Schneider and Bettes, working independently of each other, concluded that except for between three and five acres of high, dry land contiguous to Chapel Hill, the highest and best use of the land was not for cemetery purposes. The taxpayers employed John R. Farren (Farren), a professional real estate appraiser, to prepare an appraisal report on the land proposed for taking. Farren submitted his report on November 16, 1968, valuing the 25.39 acres at $101,800. Prior to being retained by the taxpayers, Farren had appraised land to be used in two cemeteries. After personally inspecting the land, Farren concluded that its highest and best use was as a cemetery in connection with Chapel Hill. On November 21, 1968, the County filed with a Florida court of competent jurisdiction a petition for condemnation of property needed for the Econ project. The petition covered the 25.39 acres of taxpayers' land proposed *66 for taking. Simultaneously with its petition, a Declaration of Taking and Estimation of Value regarding taxpayers' 25.39 acres was filed which valued the property at $41,850. On December 19, 1968, a stipulation and joint motion was filed jointly by the County, the taxpayers, and Nelson Robinson. The stipulation provided that the parties agreed to Farren's valuation of $101,800, that the County would pay $45,035 as the full amount of compensation for the taking, that the taxpayers and Nelson Robinson would make a gift to the County of $56,765, the difference between the sum paid for the property by the County and the agreed upon value, and that the Florida court would enter an order and final judgment reflecting the agreement of the parties. Pursuant to the stipulation, the Florida court entered its order of taking and final judgment on December 19, 1968. Petitioners Herbert and Susan Robinson and petitioners H. M. and Betty Armantrout, respectively, claimed a deduction for a charitable contribution to the County on their respective joint income tax returns for 1968 in the amount of $18,921.66, representing one-third of the total purported gift of $56,765. Respondent disallowed *67 the deductions in toto, determining that the value of the condemned property did not exceed $45,035, the amount paid by the County. In preparation for litigation before this Court, taxpayers retained William C. Henning (Henning) to appraise the 25.39 acres of condemned land. Henning found the value of the land as of December 22, 1968, to be $106,466.85 in a report dated February 10, 1973. Henning is a professional cemetery consultant with wide experience in cemetery feasibility studies and appraisals, but he is not a member of any national appraisal organizations, and he does not engage in real estate appraising generally. We find, as an ultimate finding of fact, that the 25.39 acres of taxpayers' land condemned by the County by order of court on December 19, 1968, had a value which did not exceed $45,035. OPINION The sole issue before us is the value of 25.39 acres of real estate owned by the taxpayers and taken by the County by condemnation on December 19, 1968. To the extent the property's value exceeds $45,035, respondent conceded that petitioners have made a charitable contribution to the County that is deductible under section 170(c) (1). When a charitable contribution *68 is made in property other than money, the deduction available to the contributor is determined by the fair market value of the property at the time of the contribution. Sec. 1.170-1(c) (1), Income Tax Regs. Where, as in the instant case, consideration is received for the property given, the deduction available is the difference between the fair market value of the property contributed and the consideration received. William Waller, 39 T.C. 665, 677 (1963), acq. 1963-2 C.B. 5. [2]
On the record before us, we find that the value of the 25.39 acres did not exceed $45,035. Thus, there is no difference between the fair market value of the property and the consideration received by petitioners and consequently, there was no contribution. On this point we are not bound by the consent order entered by the Florida court on December 19, 1968. Commissioner v. Estate of Bosch, 387 U.S. 456 (1967). Respondent and petitioners agree that the fair market value of the land should be calculated on the basis of the land's highest and best use. *69 However, they part company over what that highest and best use was. Petitioners contend that the land's highest and best use was for cemetery purposes; respondent argues it was otherwise. On the record before us, we do not reach this question because even assuming the land's highest and best use was for cemetery purposes, the petitioners have failed to overcome the presumptive correctness of respondent's determination. Rule 142, Tax Court Rules of Practice and Procedure.
Petitioners' two expert witnesses, Farren and Henning, each had experience in valuing cemetery lands. Both used a capitalization of net income method of valuation as recommended by a leading authority on cemetery appraisal. [3] However, each made an error fatal to his valuation such that neither witness' report would support a valuation greater than that allowed by respondent. Farren estimated that the 25.39 acres taken by the County would not be used for gravesites for another 70 years. Although this land did not currently produce income, and would not, under Farren's estimates, produce income for another 70 years, *70 Farren failed to defer the estimated net income from the property. He treated the income as a current stream. Assuming the validity and accuracy of every factor and assumption used by Farren in his report, had he properly deferred his estimate of net income expected from the land, the value of the land would compute to far less than $45,035. Petitioners concede that Henning made a mistake in his valuation report by failing to discount his estimate of total net income for the number of years he estimated it would take to earn that income. Although Henning properly deferred his estimate of net income he treated the estimate as if it had all been earned in one year. Thus, petitioners concede, Henning's valuation resulted in a fair market value of $79,629.67 rather than $106,466.85. Moreover, Henning utilized a 6.5 percent rate of return in his computations. This was error. Farren used an 11-percent rate, as did Schneider, and Bettes' opinion was that an appropriate rate was between 10 and 12 percent. The authority relied upon by Henning for his method of appraisal recommends a 10-percent rate, while recognizing that appropriate circumstances may dictate use of a rate as high *71 as 15 percent and no less than 8 percent. [4] Lower rates are recommended only in the case of non-profit cemeteries. [5] In this case we conclude that the 11-percent rate recommended by all the other expert witnesses would have been the correct one for Henning to use. However, even a rate as low as 8.5 percent would have resulted in a fair market value substantially lower than $45,035. Petitioners have not demonstrated to this Court that the land in question had a fair market value greater than $45,035. Decision will be entered for the respondent. Footnotes
1. All statutory references are to the Internal Revenue Code of 1954, unless otherwise specified. ↩
2. For bargain sales qualifying under section 170 and made after December 19, 1969, see section 1011(b). ↩
3. Finkle, "Appraisal of Cemeteries," Encyclopedia of Real Estate Appraising 772 (1968). ↩
4. Note 3, supra at 777-778. ↩
5. Id. at 778. ↩