T.C. Memo. 1999-213

UNITED STATES TAX COURT

ARBOR TOWERS ASSOCIATES, LTD., JAMES B. MINTZER, TAX MATTERS
PARTNER, Petitioner <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 24594-97.                    Filed June 30, 1999.

<u>Lois C. Blaesing</u>, for petitioner.

<u>Brian C. Bernhardt</u> and <u>Trevor Wetherington</u>, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

LARO, <u>Judge</u>:  Respondent issued petitioner a notice of final
partnership administrative adjustment (FPAA) on behalf of Arbor
Towers Associates, Ltd. (Arbor), wherein respondent determined
Arbor was not entitled to its claimed charitable contribution
deduction in the amount of $1.6 million for 1993.  This case

results from petitioner's petition under section 6226[1] for readjustment of the partnership items set forth in the FPAA. The issues for decision are:

1. Whether the presumption of correctness attaches to the determinations in respondent's FPAA. We hold it does.

2. Whether section 170 entitles Arbor to a charitable contribution deduction of $1.6 million in 1993. We hold it does not.

## FINDINGS OF FACT

Some of the facts have been stipulated and are so found. The stipulations and attached exhibits are incorporated herein by this reference. Arbor had its principal place of business in New York, New York, when the petition was filed.

Arbor was a New Jersey limited partnership during 1992 and 1993, and James B. Mintzer (Mintzer) was Arbor's general partner and tax matters partner. Mintzer had a longstanding business relationship with attorney Frederick Gordon (Gordon), who served as the general partner of Wolverine Towers Associates (Wolverine) from 1972 until its dissolution in 1997.

In 1974, Wolverine owned a plot of land (the land) located at 3001 S. State Street in Ann Arbor, Michigan. In order to

---

[1]Unless otherwise indicated, all section references are to the Internal Revenue Code in effect for the year in issue. Rule references are to the Tax Court Rules of Practice and Procedure, unless otherwise indicated.

develop a commercial office tower upon the land, Wolverine entered into a financing arrangement with the Trustees of the General Electric Pension Trust (G.E.) wherein G.E. purchased the land for $850,000, leased the land back to Wolverine for 55 years (the land lease), and lent Wolverine $7,650,000. Wolverine built an 11-story office building on the land which was named the Wolverine Tower Office Building (Wolverine Tower or the building).

By 1979, Wolverine began experiencing financial troubles and fell behind on the land lease and mortgage payments. On January 31, 1979, Wolverine entered into a contract for sale and leaseback (the leaseback contract) with Arbor wherein Wolverine sold to Arbor both its interest in the land lease and its interest in Wolverine Tower and contemporaneously leased back Wolverine Tower and the land from Arbor. The leaseback contract called for a purchase price of $12.6 million to be paid with interest over 5 years. After execution of the leaseback contract, Arbor owned Wolverine Tower and, having assumed the land lease, was the lessee of the land. Wolverine was the lessee of the building and the sublessee of the land from Arbor. Wolverine continued to operate the building and continued to be the lessor under the various occupancy leases in effect.

By 1992, Arbor and Wolverine wanted to sell their respective interests in Wolverine Tower and the land. On behalf of both

parties, Gordon hired a real estate broker and listed the property for sale. On December 31, 1992, Arbor and Wolverine entered into a contract (the contract) with the University of Michigan (U of M) to sell Wolverine Tower and their respective interests in the land as lessee and sublessee, with a closing date set for early 1993.[2]  The contract set the purchase price at the "fair value" of the interests being sold as determined by an appraisal to be obtained by Arbor and Wolverine.  The appraisal obtained by Arbor and Wolverine concluded the "fair value" of the property was $9 million as of December 31, 1992, and U of M purchased the property for that price on February 25, 1993.[3]  Although a "value in use" appraisal was not required by the contract, Gordon requested that the appraiser determine the "value in use" of Wolverine Tower specifically to U of M for the purpose of determining the amount of a charitable contribution deduction, if any.  The appraisal concluded that the "value in use" to U of M was $12.2 million.

To Arbor's 1993 Form 1065, U.S. Partnership Return of Income, it attached a Form 8283, Noncash Charitable Contributions, wherein it claimed a charitable contribution to U

---

[2]Contemporaneously with the sale of Wolverine Towers, on Dec. 30, 1992, G.E. sold the land to the University of Michigan (U of M) for $8 million.

[3]The $9 million figure was allocable solely to the purchase of Wolverine Tower and not to the lease interests in the land.

of M in the amount of $1.6 million, 50 percent of the difference between the sale price of $9 million and the $12.2 million "value in use".[4]  Respondent determined Arbor is not entitled to a charitable contribution deduction and disallowed the deduction in full.

OPINION

We are once again obliged to delve into the value of property, sifting through expert testimony and applying our judgment.  At the outset, we must determine which party bears the burden of proof.  Petitioner claims respondent does.  We disagree.

Petitioner argues that the burden of proof shifts to respondent because the FPAA disallows the charitable contribution deduction in full without "determining" the value of Arbor Towers.  Petitioner contends that, since respondent failed to offer evidence of value (i.e., an expert report), he has failed to meet his burden of proof.  Petitioner misconstrues respondent's determination.  On its 1993 return, Arbor set forth the $9 million sale price for the building and land, and the $12.2 million alleged fair market value.  In disallowing the deduction, respondent asserts that the fair market value of Arbor Tower was not in excess of the $9 million sale price.

_____

[4]The record does not indicate why 50 percent was deducted.

Respondent's failure to produce an expert report does not in itself allow petitioner to prevail on the issue of valuation. See Estate of Scanlan v. Commissioner, T.C. Memo. 1996-331, affd. without published opinion 116 F.3d 1476 (5th Cir. 1997); see also Brigham v. Commissioner, T.C. Memo. 1992-413 (holding the determination was not "bare" when respondent relied on sale price as evidence of the fair market value).  We hold respondent's determination is presumed correct, and petitioner bears the burden of proving entitlement to the claimed deduction.  See Rule 142(a); Welch v. Helvering, 290 U.S. 111 (1933).[5]

Turning to the primary issue, we note petitioner claimed the deduction in question under section 170, which provides, subject to certain limitations not at issue:  "There shall be allowed as a deduction any charitable contribution * * * payment of which is made within the taxable year."  Sec. 170(a).  Respondent advances three theories supporting his determination that Arbor is not entitled to the claimed charitable contribution deduction:  (1) Arbor had no interest in Wolverine Towers to convey to U of M; (2) the fair market value of the property equaled the sale price of $9 million; or, alternatively, (3) if the fair market value

---

[5]We note also petitioner seeks improperly to apply burden-shifting principles of unreported income cases to this deduction case.  See Jackson v. Commissioner, 73 T.C. 394, 401 (1979); cf. Conforte v. Commissioner, 74 T.C. 1160, 1178 (1980), affd. in part, revd. in part on another issue and remanded 692 F.2d 587 (9th Cir. 1982).

exceeded the sale price, the contribution took place in 1992 when the contract was signed and not 1993.

Regarding the first theory, we reject respondent's contention that Arbor did not own an interest in Wolverine Tower to convey to U of M. The leaseback contract clearly conveyed to Arbor both the "improvements" on the land and Wolverine's interest in the land lease. Although we are unable to find that Wolverine executed a deed transferring the building from Wolverine to Arbor, a deed was not required to transfer ownership under the facts herein. The leaseback contract stated that upon satisfactory completion of the leaseback contract terms and payments, Wolverine was to deliver to Arbor "a duly executed warranty bill of sale, * * * of the Improvements, Fixtures and Equipment, sufficient to transfer to the Purchaser the title to the Improvements, Fixtures and Equipment". While petitioner's case would have been strengthened by evidence that the contemplated "bill of sale" was ultimately executed, the absence of this is not controlling.[6] Gordon's testimony that Arbor acquired Wolverine Tower under the leaseback contract is corroborated by documentary evidence. On the totality of this

---

[6]The record contains no evidence of whether a bill of sale or other document (in addition to the leaseback contract) conveying the title to the improvements was executed.

record, we conclude that Arbor acquired Wolverine Tower under the leaseback contract and owned it until it was sold to U of M.[7]

We now turn to whether the sale was a bargain sale resulting in a charitable contribution. This will turn on whether Arbor sold Wolverine Tower to U of M for less than its fair market value. We hold it did not. A sale of property to a section 170(c) organization accompanied by a donative intent on the part of the vendor gives rise to a deductible charitable contribution if the sale price is less than the fair market value of the property sold. See United States v. American Bar Endowment, 477 U.S. 105 (1986); Stark v. Commissioner, 86 T.C. 243 (1986); Waller v. Commissioner, 39 T.C. 665 (1963).[8] The regulations under section 170 provide: "If a charitable contribution is made in property other than money, the amount of the contribution is the fair market value of the property at the time of the contribution". Sec. 1.170A-1(c)(1), Income Tax Regs. The regulations define "fair market value" as "the price at which the property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or sell and

---

[7]To embrace respondent's theory we would have to find U of M paid the $9 million solely to buy out the interests of Arbor and Wolverine in the land lease. This makes no sense and is not supported by the record.

[8]Respondent does not raise the issue of whether donative intent was lacking on these facts.

both having reasonable knowledge of relevant facts."  Sec. 1.170A-1(c)(2), Income Tax Regs.; see <u>Jarre v. Commissioner</u>, 64 T.C. 183, 187 (1975).

Fair market value is a question of fact, and the trier of fact must weigh all relevant evidence of value and draw appropriate inferences.  See <u>Commissioner v. Scottish Am. Inv. Co.</u>, 323 U.S. 119, 123-125 (1944); <u>Helvering v. National Grocery Co.</u>, 304 U.S. 282, 294 (1938); <u>Symington v. Commissioner</u>, 87 T.C. 892, 896 (1986); <u>Zmuda v. Commissioner</u>, 79 T.C. 714, 726 (1982), affd. 731 F.2d 1417 (9th Cir. 1984).  Fair market value is measured on the applicable valuation date, which, in this case, is the date of the alleged contribution.  See sec. 170(a); <u>Estate of Proios v. Commissioner</u>, T.C. Memo. 1994-442; <u>Thornton v. Commissioner</u>, T.C. Memo. 1988-479, affd. without published opinion 908 F.2d 977 (9th Cir. 1990); see also <u>Estate of Aucker v. Commissioner</u>, T.C. Memo. 1998-185; <u>Pabst Brewing Co. v. Commissioner</u>, T.C. Memo. 1996-506.  The willing buyer and the willing seller are hypothetical persons, instead of specific individuals or entities, and the characteristics of these hypothetical persons are not always the same as the personal characteristics of the actual seller or a particular buyer.  See <u>Estate of Bright v. United States</u>, 658 F.2d 999, 1005-1006 (5th Cir. 1981); <u>Estate of Newhouse v. Commissioner</u>, 94 T.C. 193, 218 (1990).  The views of both hypothetical persons are taken into

account, and focusing too much on the view of one of these persons, to the neglect of the view of the other, is contrary to a determination of fair market value. See, e.g., <u>Pabst Brewing Co. v. Commissioner</u>, <u>supra</u>; <u>Estate of Scanlan v. Commissioner</u>, T.C. Memo. 1996-331; <u>Estate of Cloutier v. Commissioner</u>, T.C. Memo. 1996-49. Fair market value reflects the highest and best use of the property on the valuation date. Fair market value takes into account special uses that are realistically available because of the property's adaptability to a particular business. See <u>Mitchell v. United States</u>, 267 U.S. 341, 344-345 (1925); <u>Symington v. Commissioner</u>, <u>supra</u> at 896; <u>Stanley Works & Subs. v. Commissioner</u>, 87 T.C. 389, 400 (1986). The reasonable and objective possibilities for the property control the valuation thereof. See <u>United States v. Meadow Brook Club</u>, 259 F.2d 41, 45 (2d Cir. 1958); <u>Stanley Works & Subs. v. Commissioner</u>, <u>supra</u> at 400.

Respondent contends that the fair market value of Wolverine Tower on the date of the alleged gift[9] was the sale price of $9 million. Respondent argues Arbor's expert supports this determination. Arbor offered the testimony of Donald Wieme

---

[9]Respondent contends the date of the gift was Dec. 31, 1992, the date the contract was signed. Petitioner contends the date of the gift was Feb. 25, 1993, the date the contract closed.

(Wieme),[10] whom we recognized as an expert in real estate valuation.  Wieme determined two values for Wolverine Tower using a valuation date of December 31, 1992.  First, Wieme determined that the "market value" was $9 million.  In reaching this value, Wieme concluded the highest and best use of Wolverine Tower was "represented by its current use as an 11 story general office facility with adjacent one story extension."  Wieme employed a sale comparison method, an income capitalization method, and a cost method.  Wieme took into account various data on Ann Arbor, Michigan (Washtenaw County), including its location, demographics, population, and economy.  Wieme followed an industry definition of the term "market value", under which the term meant:

> "Market value" means the most probable price which a property should bring in a competitive and open market under all conditions requisite to a fair sale, the buyer and seller each acting prudently and knowledge-ably, and assuming the price is not affected by undue stimulus.  Implicit in this definition is the consummation of a sale as of a specified date and the passing of title from seller to buyer under conditions whereby:
>
> 1. Buyer and seller are typically motivated;

---

[10]Wieme holds a bachelor of arts from Wayne State University and has been appraising real estate since 1964.  He holds several professional designations, including the MAI designation (American Institute of Real Estate Appraisers), the SRPA designation (senior real estate property appraiser), and the SRA designation (senior residential appraiser).

2. Both parties are well informed or well advised, and each acting in what he considers his own best interest;

3. A reasonable time is allowed for exposure in the open market;

4. Payment is made in terms of cash in U.S. dollars or in terms of financial arrangements comparable thereto; and

5. The price represents the normal consideration for the property sold, unaffected by special or creative financing or sale concessions granted by anyone associated with the sale.

Having determined the "market value" was $9 million, Wieme modified his analysis to determine the "value in use" specifically to U of M, concluding the "value in use" was $12.2 million.[11] In distinguishing between the $9 million figure and the $12.2 million figure, Wieme testified:

Within the preceding pages, we have formulated a value indication for the subject building based on the premise that the subject would be acquired by a 'typical' purchaser/investor and would continue to be utilized as a general office, multi-tenant facility. The reality of the situation, however, is that the subject building was acquired by the University of Michigan.

* * * * * * *

In an effort to identify the Value In Use of the subject building specifically to the University of Michigan, the appraisers have performed a second discounted cash flow analysis. The Value In Use is the

---

[11]Wieme modified various assumptions used given that U of M would be the only occupant of the building. For example, Wieme lowered the market rental rate and adjusted for a "refit cost" to conform the building to U of M's needs.

'value a specific property has for a specific use' and this value is not necessarily synonymous with market value.

We have wide discretion when it comes to accepting expert testimony. Sometimes, an expert will help us decide a case. See, e.g., Booth v. Commissioner, 108 T.C. 524, 573 (1997); Trans City Life Ins. Co. v. Commissioner, 106 T.C. 274, 302 (1996); see also M.I.C. Ltd. v. Commissioner, T.C. Memo. 1997-96; Estate of Proios v. Commissioner, T.C. Memo. 1994-442. Other times, he or she will not. See, e.g., Estate of Scanlan v. Commissioner, supra; Mandelbaum v. Commissioner, T.C. Memo. 1995-255, affd. without published opinion 91 F.3d 124 (3d Cir. 1996). We weigh an expert's testimony in light of his or her qualifications and with proper regard to all other credible evidence in the record. See Estate of Kaufman v. Commissioner, T.C. Memo. 1999-119. We may accept or reject an expert's opinion in toto, or we may pick and choose the portions of the opinion which we choose to adopt. See Helvering v. National Grocery Co., 304 U.S. at 294-295; Silverman v. Commissioner, 538 F.2d 927, 933 (2d Cir. 1976), affg. T.C. Memo. 1974-285; Parker v. Commissioner, 86 T.C. 547, 562 (1986); Estate of Kaufman v. Commissioner, supra; see also Pabst Brewing Co. v. Commissioner, T.C. Memo. 1996-506. The mere fact that the position of one party may be unsupported by expert testimony does not necessarily mean that the other party's

position that is so supported will prevail. See Estate of Scanlan v. Commissioner, supra.

We decline to rely on Wieme's testimony as to the "value in use". As a threshold matter, the conclusion derived by an expert's analysis must be reached by application of the correct standard before we will rely on that conclusion. That was not done in this case. The applicable regulations mandate the use of a "fair market value" standard as defined therein. See sec. 1.170A-1(c)(1) and (2), Income Tax Regs. That standard contemplates a hypothetical seller and buyer and precludes consideration of the specific characteristics of any particular seller or buyer. The $12.2 million figure upon which Arbor relies was derived not by employing the applicable standard but by employing an improper standard which took into account the specific buyer, U of M, and its characteristics. Even if we were to agree with Wieme that the "value in use" to U of M was $12.2 million, and we stop short of so doing, this would not aid Arbor in its quest for a charitable contribution deduction since that figure does not represent the "fair market value" of Wolverine Tower on the valuation date within the meaning of the regulations.

The standard employed by Wieme to derive the $9 million "market value" figure resembles much more closely the "fair market value" standard applicable in this case. Were we to rely

on this figure, this too would leave unsubstantiated Arbor's claim to a charitable contribution deduction since the $9 million was the sale price.  While we have other significant concerns with Wieme's testimony, including that he valued the building 2 months before the valuation date with no analysis of whether the applicable assumptions remained unchanged, our holding that his testimony is unreliable because of the application of an improper standard renders unnecessary further discussion of those concerns.  Petitioner has failed to prove that the fair market value of Wolverine Towers was greater than the $9 million sale price.[12]  We sustain respondent's determination.

To reflect the foregoing,

Decision will be entered

for respondent.

---

[12]We need not address respondent's last argument that the gift occurred on Dec. 30, 1992, not on Feb. 25, 1993, upon the closing.